[Nos. G036327, G036328, G036329, G036330, G036331. Fourth Dist., Div. Three. Feb. 23, 2007.]

JACQUELINE B. REEDY, as Trustee, etc., Plaintiff and Respondent, v. LETANTIA BUSSELL et al., Defendants and Appellants.

## Counsel

William Salzwedel for Defendants and Appellants.

Meserve, Mumper & Hughes, Bernard A. Leckie; and Alan M. Reedy for Plaintiff and Respondent.

## Opinion

**BEDSWORTH, J.**—Letantia and Todd Bussell appeal from the judgments entered against them on five probate petitions joined for trial. These judgments followed the imposition of terminating sanctions. Letantia and Todd[1] argue, among other things, that the court abused its discretion in imposing such a draconian punishment. We disagree. Letantia and Todd's entire course of conduct in this case can be fairly summed up in two words: "Make me." Respondent Jacqueline B. Reedy had to do so repeatedly, filing motions with the court to force their compliance with discovery obligations, and at other times simply caving in to their unreasonable demands for accommodations. The court consistently gave Letantia and Todd the benefit of the doubt, and strongly indulged the policy preference for allowing matters to proceed on their merits.

---

[1] With the exception of Jacqueline Reedy, daughter of Helen and Elmer Bussell, all of the parties, as well as additional participants in the events giving rise to this litigation, share the last name Bussell. Consequently, for the sake of clarity, we refer to each of the Bussells by first name. No disrespect is intended.

Despite this, when the trial commenced, Letantia and Todd had still not fully complied with the court's discovery orders. Nonetheless, the court merely took under submission Reedy's motion for terminating sanctions, and allowed the matter to go forth. It was only after several days of trial, followed by additional discovery shenanigans, that the court finally became convinced Letantia and Todd were not going to change their ways, and awarded Reedy the requested sanctions. Based upon the record before us, we can only wonder what took it so long.

The other arguments pressed by Letantia and Todd regarding the propriety of the terminating sanctions fare no better than their abuse of discretion plea, and we consequently conclude those sanctions were not in error. However, another issue raised by Todd does have merit. As Todd points out, the court entered default judgments awarding significant monetary damages against him on two of Reedy's petitions, despite the fact that those petitions failed to specifically identify the amounts of damages he was alleged to have caused. It was error to do so, and we consequently reverse the judgments against Todd on those petitions and remand the case to the trial court for reconsideration of the sanctions against Todd with respect to them.

\* \* \*

The five consolidated petitions in this case each relates to one of three trusts set up to benefit the family of Helen Chamness Bussell. The first trust, set up by Helen's late husband, Elmer, is the Elmer Jacob Bussell Testamentary Trust (the Elmer Trust.) The second and third trusts, set up by Helen, are collectively entitled the Helen Chamness Bussell Family Trust. That instrument includes both the initial trust, which is revocable, and the gift trust, which is irrevocable.

Helen and Elmer's son, John Bussell, was named trustee of both the Elmer trust and the two trusts created by Helen. However, in the wake of John's death by suicide in February of 2002, Helen and Elmer's daughter, Jacqueline Reedy, was named cosuccessor of the Elmer Trust, and successor trustee of the two Helen trusts. In that capacity, Reedy discovered what she believed to be evidence that John had improperly withdrawn money, for his own benefit, from both the Elmer Trust and Helen's revocable initial trust.

Consequently, in early 2003, Reedy filed two petitions. The first one stated several causes of action based upon John's allegedly improper withdrawals from the initial trust, and specifically identified the withdrawals at issue, including over $100,000 transferred into his personal account, over $20,000

spent on European "study-abroad" trips for John's two daughters, and $200,000 paid to an attorney representing John in connection with criminal fraud and tax evasion charges filed against John and his wife, Letantia. The petition sought recovery from Letantia, both individually and as trustee of a separate trust which she and John had established during his lifetime. This petition also sought recovery against Todd Bussell, Letantia and John's son, alleging he had appropriated an access number issued to John as trustee of a brokerage account belonging to the initial trust, and improperly used that number to cause the sale of certain stock belonging to the trust.

Reedy's second petition alleged similar misconduct, including improper withdrawals by John, and improper use of the brokerage access number to trade stock by Todd, in connection with the Elmer Trust.

Reedy's third petition, filed in July of 2004, sought instructions from the court, and monetary contributions from trust beneficiaries for losses incurred in connection with ranch property owned by Helen's gift trust.

The other two consolidated petitions were filed by Todd. The first of these two, filed in April 8, 2003, challenged the validity of the sixth amendment to Helen's family trust, which was executed by Helen in June of 2002, in the wake of John's death. That amendment, among other things, had altered the initial trust to make Reedy its sole beneficiary, and revoked all prior amendments. This petition also sought "construction" of the fourth amendment to that trust, which purportedly contained terms which authorized John to make the trust withdrawals for his own benefit.

The second of Todd's petitions, filed in October of 2003, sought to have Reedy removed as trustee of the gift trust, alleging she was not eligible to serve under the terms of that trust. This petition also sought damages for various alleged improprieties committed by Reedy in the course of her trusteeship, as well as an accounting and instructions. This petition also initially contained a request to quiet title to a property known as "the ranch," and to dissolve a partnership formed to own it. However, the quiet title and partnership dissolution claims were subsequently withdrawn.

By a supplement to this second petition, Todd also sought to effectuate the terms of a document which he had arranged to have 97-year-old Helen sign before a notary in January of 2004. That document purports to "release" John from any liability for his acts as trustee, to give him post hoc authorization for any and all of his acts as trustee, and to request that Reedy dismiss her

petitions seeking to hold him liable for his alleged improper withdrawals of trust money. The document further contains a release in favor of Letantia and Todd, for any acts committed "both during and after the life of John Bussell," and requests that Reedy dismiss any claims against them as well.[2]

The litigation of these petitions did not go smoothly, and Letantia and Todd were represented by at least three different counsel in the course of the proceedings. Although each side accused the other of failing to properly comply with discovery obligations, Reedy appeared to have a particularly difficult time obtaining compliance. In July of 2003, she filed motions to compel answers to requests for admissions and form interrogatories from Todd; answers to requests for admissions and form interrogatories from Letantia; as well as a petition to compel Letantia to turn over documents which properly belonged to Reedy as the successor trustee of the trusts. As set forth in those motions, Letantia and Todd had objected to each and every question and request propounded to them, with a litany of "irrelevant," "overly broad" and "vague and ambiguous" objections. They offered not a scintilla of information in response to the discovery.[3] Approximately a week before the hearing on the discovery motions, Letantia filed a declaration stating, in effect, that she was simply too busy to comply with her discovery obligations, and was seeking new counsel to represent her in the litigation.

On August 8, 2003, Reedy also filed a motion to compel Todd to produce documents, and for imposition of conditional terminating sanctions. This was followed by a motion to compel Todd to appear for his deposition, as well as a motion to compel Letantia to appear for a deposition and produce documents. In September of 2003, new counsel for Letantia and Todd filed a declaration in anticipation of a continued hearing regarding the various discovery motions. He explained that he had expended substantial effort familiarizing himself with the file and assisting Letantia and Todd in preparing supplemental discovery responses. He also explained that while he had met with Letantia on three occasions, he had yet to meet with Todd, who was under the care of a psychologist. Counsel attached to his declaration a

---

[2] According to the man who notarized the scribble Helen placed near the signature line on that release document, he was contacted about the notarization on a Sunday, and traveled to Helen's home that night. The document was executed by Helen from her bed, *at midnight*, with all in attendance, including Todd, standing around the bed.

[3] As one example, Todd, who filed a petition in April of 2003, questioning the validity of Helen's sixth amendment to her initial trust, objected to a request for admission that Helen was "fully competent" when she executed that amendment, by claiming the request was "vague, ambiguous and not calculated to lead to the discovery of admissible evidence."

copy of a letter, purporting to be from Todd's psychologist, which recommended that "due to the ramifications from . . . his father's suicide, he be permitted to be deposed in any litigation through written questions. . . ."[4]

The various discovery motions were continued again, and counsel kept the court apprised of their efforts to resolve some of the outstanding issues. Finally, on October 31, 2003, the matters came on for hearing. Todd was sanctioned $750 for "all the delaying tactics" leading up to the order requiring him to appear for his deposition. At that time, the court also appointed the Honorable Tully Seymour, retired, to act as discovery referee, explaining it was necessary "since you people are in here every other week regarding discovery issues."

In January of 2004, Judge Seymour issued his first report on the then pending discovery motions. He characterized Letantia's and Todd's initial interrogatory responses as a "sham," and concluded they "chose to pursue a deliberate pattern of evasion." He recommended they be ordered to answer without objection. He stated that, but for a technical defect in the request for monetary sanctions, he "would unhesitatingly recommend sanctions." Judge Seymour concluded that some of the objections initially made by Letantia and Todd to Reedy's requests for admissions were well taken, and that the supplemental responses served by substitute counsel were in "substantial compliance." He recommended denial of the motion to deem the requested matters admitted. Finally, Judge Seymour concluded that the motions to compel production of documents should be denied, in favor of additional "meet and confer" sessions. Seymour acknowledged that Reedy had been frustrated in her efforts to obtain documents, but expressed the belief that "with new counsel [representing Letantia and Todd] there is every reason to believe that discovery can proceed more smoothly."

In February of 2004, the court issued an order directing Letantia to turn over certain documents, records and other items related to Helen's family trust, accumulated by John in the course of his trusteeship, to Reedy as successor trustee. The court also ordered that the trial of the consolidated petitions would be bifurcated, so that the issue of whether John, as trustee of the initial trust and gift trust, had authority to make the disbursements to himself and his family which had been challenged in Reedy's first petition would be tried first. The initial phase would also specifically include resolution of whether the fourth amendment to the Helen Chamness Bussell Family Trust was validly executed and an interpretation of its provisions.

---

[4] Despite Todd's fragile emotional state, which allegedly precluded him from participating in normal discovery, he initiated his second petition against Reedy the following month.

In March of 2004, Letantia and Todd's new attorney petitioned to withdraw from the case. The following month, Reedy filed a motion for terminating sanctions against Letantia, based upon her failure to comply with the court's February 2004 order requiring that she turn over the trust documents, records and other items to Reedy. In opposition to that motion, Letantia argued, in essence, that she should not have to comply with the order, because she had a "power of attorney" over Helen, which "imparts to her a burden to look after the interests of Helen . . . with regard to the Initial Trust . . . ." She further asserted she "has reason to know that . . . Reedy will not properly account to . . . Helen" and consequently that if Letantia were "to transfer all the items requested, she will have breached her fiduciary duty to Helen . . . ."

In July of 2004, Judge Seymour issued an additional report concerning additional motions filed by Reedy. He recommended denial of Reedy's motion for terminating sanctions against Todd and Letantia based upon their failure to timely respond to additional interrogatories. He reasoned that although the responses were inexcusably late and filled with "sham" objections, they *were* ultimately served, and that as a consequence only monetary sanctions would be appropriate. Because of the late response, however, he concluded any objections had been waived, and Letantia and Todd should now be ordered to answer without objection. Judge Seymour likewise recommended against imposing terminating sanctions against Todd and Letantia based upon their continued refusal to submit to a deposition. Both of them claimed to have the flu on the dates of their scheduled depositions. Judge Seymour reasoned that although "it would not be surprising [if their claimed flu] was bogus . . . [they should] be given the benefit of the doubt."

Also in July of 2004, Reedy filed another motion for terminating sanctions against Letantia and Todd, this time based upon their refusal (and that of their new counsel, William Salzwedel), to comply in good faith with Judge Seymour's earlier recommendation of a "meet and confer" concerning the production of documents requested by Reedy more than a year earlier. In essence, Reedy reported that Letantia and Salzwedel had insisted Reedy's counsel appear in the early morning at a hotel in Bel Air, sit with them while they had breakfast, and left without either offering any documents or engaging in any substantive discussion.

The following month, Reedy filed a motion to compel Letantia to appear at her deposition, and sought, in the alternative, terminating sanctions based upon her failure to cooperate. In response to this motion, Letantia pointed out that she had already appeared for one day of deposition, and argued that Reedy simply had no right to more than that. According to Letantia, if a party

were allowed to claim they were "not finished" at the end of the first day of deposition, and thereby compel a deponent to come back on another day, it would "render . . . meaningless" the "one deposition rule" set out in Code of Civil Procedure former section 2025, subdivision (t). Letantia's counsel went so far as to assert "[t]he purpose behind the 'One deposition Rule' is to spare a natural party from more than one day of deposition." Letantia also argued that she was an insulin-dependent diabetic, and it was consequently "unreasonable" to expect her to drive any significant distance for her deposition.[5]

On September 3, 2004, the court conducted a hearing to review the various discovery disputes, including those considered by Judge Seymour, along with his recommendations. At the conclusion of that hearing, the court informed the parties it would take all the motions under submission, but ordered that any future motions may be filed only "with leave of the court" sought by ex parte motion.

The court's orders stemming from the September 3, 2004, hearing required Letantia to appear for one additional day of deposition, before October 15, 2004. The motion to require Todd to appear for his deposition was denied as moot. Additionally, Letantia and Todd were required to respond to interrogatories propounded by Reedy, without objection, and to pay monetary sanctions. Finally, as to the outstanding document requests, the court ordered Reedy to file yet another update "as to any remaining disputed issues," and left it at that.

On September 8, 2004, Reedy informed the court that while she had prepared a trial setting conference statement, and Helen's appointed counsel had signed off on it, Letantia and Todd's new counsel, Salzwedel, had failed to do so. Letantia, acting in her individual capacity,[6] had actually refused to participate, claiming she had not been given sufficient time to review it.

Unfortunately, the court's orders to Letantia and Todd regarding their interrogatory answers did not specify a particular *deadline*, and so they consequently failed to produce any within a reasonable period of time. Thus, in early February of 2005—*nearly six months later*—Reedy was forced to

---

[5] These protestations appear to be entirely inconsistent with Letantia's and Todd's insistence that Helen, at 97 years of age, submit to an open-ended deposition. After two full days, that deposition was terminated only after a protective order was sought.

[6] By this point, Letantia had fashioned a hybrid form of representation for herself in the litigation. She elected to be represented by attorney Salzwedel only in her capacity as trustee of the trust established by her and John; she chose to represent herself, in propria persona, in her individual capacity.

make an ex parte application to obtain a deadline for the interrogatory answers. The court then imposed a February 25, 2005 deadline.

At that point, the trial was already fast approaching, with the date set for March 30, 2005. Nonetheless, on March 4, 2005, the parties appeared in court for yet another round of motions concerning the inadequacy of Letantia's and Todd's discovery responses. Reedy again sought issue sanctions, evidentiary sanctions and terminating sanctions against Letantia and Todd, arguing that they had failed to comply with the court's September 3, 2004 order requiring them to answer the interrogatories without objection, requiring Letantia to appear for an additional day of deposition, and requiring them to pay monetary sanctions.

As Reedy explained, not only did Letantia's and Todd's latest interrogatory responses include "boilerplate" objections, but the "answers" were evasive, at best—amounting to a significant number of "I don't understand the questions" without any effort to fairly interpret them.[7] Salzwedel, the new attorney, attempted to justify the inadequate response by insisting "if [Letantia] doesn't know what the question means, then she doesn't know what the question means." Salzwedel also acknowledged there was boilerplate language at the beginning of the responses, but claimed he hadn't realized it actually contained objections.

With respect to her deposition, Letantia argued that the court set a specific timeframe within which the deposition was to take place, and when Reedy did not manage to schedule it within that timeframe, Letantia no longer had any obligation to appear. Of course, Reedy's counsel countered that he had tried to notice it within the original timeframe, to no avail. Ultimately, the court continued the motion for terminating sanctions, to give Reedy's counsel time to lodge the discovery response documents with the court. He did so.

On March 18, 2005, the parties participated in a mandatory pretrial "issues conference." At that time, Reedy provided Letantia and Todd with an exhibit list (along with a compilation of the proposed exhibits), a witness list, a trial

---

[7] For example, special interrogatory No. 1 to Letantia asked: "Has attorney William Seligman rendered any legal services to you?" Letantia's answer was "I do not know what you are referring to. I do not know what you are asking." Special interrogatory No. 6 to Letantia was "Please state who the Trustees are of the BUSSELL FAMILY TRUST, dated August 18, 1982." Letantia's answer was "I do not know what you are talking about." Special interrogatory No. 201 to Letantia was "Did you cause the sale of 2,000 shares of Lowes Corporation stock out of the Helen Chamness Bussell Trust dated 7/30/1982 to be made?" Letantia answered "I am not sure whether or not there was such a sale. I do not even know if such a sale existed or if you are making it up." Todd was also asked about his involvement in the transfer of Lowes stock belonging to the Elmer Trust, and he too responded with a "I do not know what you are talking about."

brief and four motions in limine. Her first two motions sought entry of default against both Todd and Letantia, on the grounds they had failed to timely respond to her petition in one case and one of her amended petitions in another.

Reedy's third motion in limine renewed the request for issue, evidentiary and terminating sanctions against both Letantia and Todd, on each of the five petitions, based upon their continuing uncooperative and obstructive behavior, and their noncompliance with discovery obligations and court rules. This in limine motion included a formal notice of motion with a specification of the particular sanctions requested, a memorandum of points and authorities, and a declaration establishing the factual grounds upon which the motions were based. In addition to conduct raised in prior motions, Reedy pointed out that Letantia and Salzwedel had continued with unreasonable behavior during a recent witness deposition, and that Letantia and Todd had yet to comply with the court's orders requiring them to fulfill their discovery obligations. Reedy pointed out she was substantially prejudiced by her continued inability to get the business records maintained by John during his tenure as trustee of the trusts.

Reedy subsequently filed an additional motion in limine seeking sanctions based upon Letantia and Todd's failure to fulfill their own obligations in connection with the required pretrial issues conference—she noted that in contrast to her extensive efforts, they had proffered no copies of their proposed trial exhibits (despite a list numbering almost 160), and exchanged no trial brief or statement of issues.

The continued hearing on the noticed sanction motion took place a week later, on March 25, 2005. At that time, the court again continued the motion for sanctions, directing that it "be heard with the accounting trial," and advised the parties "you can make your arguments to that judge."

Letantia and Todd filed only a cursory opposition to Reedy's motions in limine. Their opposition to the motion for terminating sanctions included only the conclusory allegation that Reedy's counsel had "committed perjury in this case on numerous occasions in his inflammatory twisted declarations," an argument that the motions had already been heard by a discovery referee, and the explanation that their counsel "cannot waste anymore [sic] time trying to counter the garbage in such motions." Letantia and Todd also opposed the motions in limine seeking entry of their defaults on the petitions to which they had filed no responses. Attached to those oppositions were both a proposed answer *and a demurrer* by each of them to one of the petitions.

The trial began as scheduled on March 30, 2005, and the court first noted, in connection with the default motions in limine, that as it had no filed copy of any requests for entry of default against Letantia and Todd relating to Reedy's petitions, it would proceed on the merits of those petitions. The court also informed the parties it was familiar with the motions for sanctions, including terminating sanctions, as well as Letantia's and Todd's "somewhat summary denials"—denials it then characterized as a "somewhat shallowless[*sic*]-than-probing response to an otherwise very specific and amplified liturgy of complaints with respect to what went on in the discovery process." The court later agreed the opposition was "remarkably sparse and inadequate."

The court explained, however, that rather than ruling on the request for terminating sanctions, it would take the sanctions motions under submission, and if, during the course of trial it determined Reedy had been prejudiced "in a significant way" by Letantia and Todd's "stonewalling," it would take that into consideration on an "issue-by-issue basis in determining whether or not sanctions would be appropriate."

The trial did not proceed smoothly. Over Reedy's objection, Letantia continued to represent herself individually, while allowing Salzwedel to represent her in her capacity as trustee of the trust she had established with John. Her enthusiasm for the role of trial attorney far exceeded her skill, and she was singularly undaunted by the cascade of sustained objections to her questions. Although the court was unfailingly polite and respectful to Letantia, she nonetheless accused it of bias against her, of committing "continued judicial misconduct," and ultimately sought to have the court recuse itself.

There was also some confusion about the order in which the parties would put on their cases. Because the trial had been bifurcated, it would proceed first on the issue of interpreting the initial provisions of Helen's family trust, and the fourth amendment thereto, to determine whether John's challenged withdrawals in the course of his trusteeship were justified. This issue was raised in both Reedy's and Todd's petitions. The court indicated its tentative thinking, after reading the documents, was that the trustee would not have unfettered discretion to take whatever amounts he wanted from a trust for his personal use, and that he would have to show some evidence of authorization from either the trustor or the other beneficiaries for such withdrawals. Consequently, the court concluded Letantia and Todd should have the initial burden, as John's representatives, to demonstrate "the propriety of his actions."

Neither Letantia nor Salzwedel (Todd was not present in court) initially raised any objection to this proposal, and immediately called their first witness. The first day of taking evidence proceeded in this manner. Unfortunately, the next day brought a change of heart. When trial convened, Letantia and Salzwedel immediately moved for a mistrial, arguing that as "this part of the bifurcation has to do with the petition brought by . . . Reedy . . . she was supposed to go first . . . . [¶] . . . They haven't put on their case and we are making a nonsuit on that basis." At that point, the court acknowledged that Reedy had the ultimate burden of proving misappropriation, but noted that the court had the power to direct the order of proof, and that Letantia and Salzwedel were apparently in agreement with its proposal on the prior day.

The court also explained that as it understood the case, the fact of John's questionable withdrawals was undisputed, and that consequently it made sense to proceed directly to the evidence demonstrating the propriety of those withdrawals. Letantia disagreed with that latter point, making it clear she was insisting on formal evidence, from proper custodians of record, to establish the facts of John's expenditures, before she should have to make any effort to defend them.

The court then inquired, since Letantia and Salzwedel "are not comfortable with going first," whether Reedy was prepared to call a witness. Her counsel noted they would like to call Todd to the stand, but he was not present, despite their having served him with a notice to appear. Letantia immediately did an about-face, and responded with "We would like to call Helen Bussell as a witness right now. She was supposed to show up . . . ." The court was agog: "I am looking for some consistency from you. They are proceeding and your proposition that you would call another witness right now is utterly astounding." It then reverted to its initial proposal, and directed Letantia and Salzwedel to proceed with their case.

The effects of Letantia's and Salzwedel's obstreperousness were also felt as Reedy sought to introduce evidence of the payments John had made to his criminal defense attorney from the trust account. Letantia and Salzwedel objected to introduction of the checks, despite the testimony of the attorney himself regarding the payments, based upon the assertion he actually had insufficient personal knowledge of his firm's finances to authenticate the copies. The court warned them that this was the sort of prejudice it had alluded to as being significant in deciding the motions for terminating sanctions. "A lot of these foundational considerations are usually eliminated during the trial setting conference and during the course of discovery. [¶] The court is mindful of the motions in limine . . . and the court is now privy to

what has transpired or didn't transpire or what should have transpired at the issues conference."

The obstreperous conduct continued, however, as did the court's warnings. At one point, the court warned Letantia that her trial conduct "dovetail[ed] in with the difficulty [Reedy] has had with discovery and obtaining responses to discovery. And the court has taken their motion for terminating sanctions under submission. [¶] But the more this trial goes on, I feel their position has merit."

At another point, Letantia and Salzwedel moved to exclude the trial testimony of a third party witness called by Reedy, on the basis they had subpoenaed her for a deposition and she had not appeared. The court warned them that if they were asking for it to take a hard line against discovery abuses, it would have to do the same for both sides, and gave them a chance to withdraw their request. They did so, but only on condition the court order the witness to make herself available for later proceedings.

Later, when Reedy made yet another motion for imposition of sanctions, complaining that, several days into trial, Todd had yet to appear and Letantia had yet to comply with her obligation to produce documents, Letantia made no effort to address those concerns. Instead, she again pointed out that Helen, at 99 years of age, had also not yet appeared at trial (as though that excused Todd), and both she and Salzwedel asserted that any complaints about unfinished discovery were simply untimely and need not be addressed. The court once again reminded them that the motions for sanctions, including terminating sanctions, were still under submission.

Undeterred by that warning, Letantia and Salzwedel immediately sought to call Helen as a witness, despite knowing she was not present. The court responded by tentatively deeming the then 99-year-old woman "unavailable," and suggesting the parties should rely upon her two-day deposition instead. Letantia and Salzwedel argued vehemently that if Helen was fit enough to go out to lunch, she was fit to appear and testify at trial. The court inquired of Norbert Bunt, Helen's appointed attorney and guardian ad litem, regarding her ability to do so. Bunt responded that since the travel time between Helen's home and the court was approximately an hour and a half each way, she would likely be unable to both complete that trip and offer any meaningful testimony. The court agreed, and despite additional objections from Letantia and Salzwedel, reiterated its conclusion that Helen be deemed unavailable for trial.

After four days of trial, the parties agreed to a recess for the purpose of exploring mediation of their dispute. Unfortunately, that effort was unsuccessful, and the parties reconvened before the court on July 8, 2005, to set a date

for the continued trial. Reedy filed additional papers reminding the court that her sanction motions were still under submission, and urging that they be granted in light of Letantia's and Todd's obstreperous behavior during trial, and their continued failure to comply with discovery orders. The court acknowledged that the motions had yet to be ruled on, and informed Letantia and Salzwedel that it had been "disappointed with their conduct in the trial to date." The court warned them that their trial conduct had merely "amplifie[d] and complement[ed] the . . . belabored history that [Reedy has] presented, and the frustrations [she has] experienced, that would warrant a granting of the motion." Letantia responded by asserting it was too late to grant terminating sanctions, because trial was already underway.

With respect to a date for the continued trial, Reedy proposed August 22, 2005, and Letantia and Todd requested October 26, 2005. Both Letantia and Counsel Salzwedel argued strongly that they would not have sufficient time to prepare for the resumed trial by August, particularly in light of a quiet title action also scheduled for trial in San Diego. After much discussion regarding the parties' respective positions, however, the court set the matter for the August date. Salzwedel responded by accusing the court of bias—against Letantia for her lack of training as an attorney, and against him for having less experience than Reedy's counsel. When Reedy's counsel requested confirmation that her prior requests for production of witness and documents in connection with the trial would remain in effect, Letantia merely expressed confusion, and took the surprising position "that he has received all documents, and all witnesses have been produced."

On July 27, 2005, Reedy filed an ex parte motion to quash a subpoena for the deposition of the notary public who had notarized Helen's signature on the sixth amendment to her family trust. Reedy pointed out, among other things, that the time for taking new discovery in connection with the pending trial had long past. When asked to cancel the deposition, Letantia and Todd's counsel had asserted that the deposition was not being sought in connection with the pending trial (in which the sixth amendment was at issue) but in connection with another pending petition, *relating to the Elmer Trust*, which had not yet been set for trial.

At the ex parte hearing, the court denied immediate relief, but directed that the deposition date be reset pending a hearing on the motion to quash. It also, once again, warned Letantia and Todd's counsel: "[the ex parte request] has significance in it that should be heeded by you, and if there's any way that you can meet and confer prior to actually having the court rule on this, it might be in your best interest, and your client's best interest to do that." The

court set a continued hearing for August 12, 2005. Letantia and Todd then filed an opposition, arguing that the deposition subpoena was valid and properly served, and that the notary's testimony would be relevant to issues also raised in two later petitions Todd had filed, which were not included in the current trial.

On August 11, one day before the hearing, Reedy filed an ex parte request that the court quash an additional *11* depositions scheduled by Todd and Letantia to take place prior to the recommencement of the pending trial on August 22, 2005, and to impose the previously requested issue and terminating sanctions. Ostensibly, each of these new depositions was also being sought in connection with the two other petitions not included in the pending trial, but Reedy characterized that contention as a "sham and deception," in light of the matters at issue in those remaining petitions.

The trial court's written tentative ruling made clear it found Letantia and Todd's contention that their sudden spate of new discovery was intended to relate to the *other* petitions (which were not yet even set for trial) to be incredible. As the court noted, the assertion that Letantia and Todd were suddenly trying to complete 12 depositions in connection with *those* petitions, prior to the August 22 resumption of trial in this case, was entirely inconsistent with counsel's prior representation that it would be practically impossible to even prepare this case in time, in light of the other pending matter in San Diego. Consequently, its tentative decision was to quash the subpoenas, and impose both monetary sanctions and terminating sanctions.

With respect to the imposition of the terminating sanctions, the court's tentative ruling explained that it had given Letantia and Todd the opportunity to proceed at trial, despite the "virtually unopposed" motions in limine spelling out the case for terminating sanctions. However, their performance in that trial, as well as their "inappropriate" attempted discovery, were both factors in its ultimate decision to terminate the case.

At the hearing, Reedy's counsel appeared and submitted on the tentative ruling. Neither Letantia nor Salzwedel was present, however. Instead, another attorney informed the court she was making an appearance on Salzwedel's behalf, because he was engaged in another courtroom. She reminded the court of Salzwedel's position that the new discovery was "on two petitions that are separate from the five petitions that are currently in trial," and that "it's his position that he has the right to discovery on these two petitions." The court assured her that it understood Salzwedel's argument, and then announced that "the tentative ruling is hereby made the order of this court." The court vacated the pending trial, but retained the case on the court's calendar for

what it characterized as a default prove-up. Based upon the evidence, the court entered judgments on each of the five petitions.

I

Letantia and Todd first contend the motions for terminating sanctions were "defective," for several different reasons. They assert the motions were made without the required period of notice; amounted to an improper use of the motion in limine procedure; and were disguised attempts to seek reconsideration of the court's denial of prior sanction motions, without compliance with Code of Civil Procedure section 1008.

The contention regarding proper notice fails for at least two reasons. First, the issue was clearly waived. Although Letantia's and Todd's oppositions to Reedy's motions in limine for terminating sanctions were—to put it mildly—cursory, they did file written opposition. And in doing so, they never so much as suggested notice was defective.[8] Letantia and Todd also appeared at the commencement of trial when the court considered the motions and took them under submission—again without asserting any defect in the notice.

As explained in *Tate v. Superior Court* (1975) 45 Cal.App.3d 925, 930 [119 Cal.Rptr. 835], "[i]t is well settled that the appearance of a party at the hearing of a motion and his or her opposition to the motion on its merits is a waiver of any defects or irregularities in the notice of the motion. [Citations.] This rule applies even when no notice was given at all. [Citations.] Accordingly, a party who appears and contests a motion in the court below cannot object on appeal or by seeking extraordinary relief in the appellate court that he had no notice of the motion or that the notice was insufficient or defective." (See also *Eliceche v. Federal Land Bank Assn.* (2002) 103 Cal.App.4th 1349, 1375 [128 Cal.Rptr.2d 200]; *Pacific Std. Life Ins. Co. v. Tower Industries, Inc.* (1992) 9 Cal.App.4th 1881, 1888 [12 Cal.Rptr.2d 524] ["Tower has waived its right to complain of insufficient notice of the motion for judgment [because it] did not object to the motion on the ground of lack of notice."].)

Indeed, in *Carlton v. Quint* (2000) 77 Cal.App.4th 690 [91 Cal.Rptr.2d 844], the court concluded that even when the opposing party does expressly

---

[8] Letantia and Todd assert on appeal that their opposition to the motion in limine did include a argument that "due to the late filing of the motions, there was insufficient time to respond," and that this constituted an objection to the inadequate period of notice. But that is revisionist history. The document said no such thing. Instead, it accused Reedy's counsel of perjury, asserted that the motion was merely a rehash of prior complaints, and stated that counsel had no further time to waste on such "garbage." We would be hard-pressed to construe that dismissive and insulting language as an objection to the notice, and certainly cannot fault the trial court for failing to do so.

object to the inadequate notice in its opposition papers, it may not be sufficient to preserve the issue for appeal. Instead, if the party appears at the appropriate hearing and opposes the motion on the merits—but without making any request for a continuance or demonstrating *prejudice* from the defective notice, the issue is waived: "[D]espite his claim of inadequate service and notice in his opposition to the motion and at the summary judgment hearing, Carlton *did* file an opposition to the motion, appeared and argued at the hearing, never requested a continuance of the hearing and never claimed prejudice by reason of insufficient notice or service. *Under these circumstances, we conclude Carlton waived any claim of inadequate service or notice assuming, without deciding, that claim had any merit.*" (*Id.* at p. 697, italics added.)

And this brings us to the second major flaw in Letantia and Todd's inadequate notice argument. In order to obtain a reversal based upon such a procedural flaw, the appellant must demonstrate not only that the notice was defective, but that he or she was *prejudiced.* (*Israni v. Superior Court* (2001) 88 Cal.App.4th 621 [106 Cal.Rptr.2d 48]; *Cordova v. Vons Grocery Co.* (1987) 196 Cal.App.3d 1526 [242 Cal.Rptr. 605]; Code Civ. Proc., § 475.) As explained in *Lever v. Garoogian* (1974) 41 Cal.App.3d 37, 40 [115 Cal.Rptr. 856], "Procedural defects which do not affect the substantial rights of the parties do not constitute reversible error. (Code Civ. Proc., § 475.)"

In this case, not only have Letantia and Todd failed to make any showing of prejudice, but an objective review of the facts conclusively negates the idea. The record before us demonstrates Reedy gave Letantia and Todd repeated notices that she was seeking terminating sanctions, both before and during trial. Her final pretrial motion for terminating sanctions, made on regular notice, was ordered by the court to be heard in connection with the trial—and thus Letantia and Todd were expressly placed on notice that the issue would be taken up at that time.

Reedy's motions in limine—although served on Letantia and Todd prior to the court's decision that the terminating sanctions would be considered at trial—operated, in effect, as a reinforcement of the court's directive. There was simply no basis for them to contend they did not realize the issue would be before the court at the commencement of trial.

As if that were not enough "notice," the court itself gave Letantia and Todd repeated warnings, during the course of trial, that it had taken Reedy's request for the sanctions under submission, and was considering imposing them. Months passed, without Letantia or Todd ever attempting to offer additional opposition on the merits of the sanction motions. And while Letantia and Todd now assert they would have been precluded from offering

any such opposition, because the motions were "under submission," they rather inconsistently chastise the trial court for allowing Reedy to file additional documents related to the motions during the submission period.

We presume that if Letantia and Todd had ever sought to file additional opposition to the requested sanctions, the court would have considered it on the same basis as it considered Reedy's additional filings. Their failure to make any effort cannot be blamed on either the court or Reedy, and certainly cannot be attributed to any lack of "notice." Indeed, more notice of the requested terminating sanctions—and more opportunity to be heard in opposition—could hardly be imagined.

Letantia and Todd's next contention, that the motions amounted to an improper use of the in limine procedure, fares no better. They rely upon this court's opinion in *R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327 [44 Cal.Rptr.3d 426], and specifically on the concurring opinion of Justice Rylaarsdam—in which he decries the use of in limine motions as a substitute for summary judgment or summary adjudication motions, but without the procedural protections otherwise afforded in connection with the latter. That concern is inapplicable here, however, because the motions made by Reedy were not disguised motions for summary judgment or adjudication, but were instead a renewal of her prior, properly noticed motion for terminating sanctions—a motion which the court had expressly directed *should be decided in connection with the trial.* There was simply no procedural shortcut attempted.

Moreover, to deny Reedy the opportunity to have her sanctions motion considered on the merits, merely because Letantia's and Todd's continuing disregard of their obligations required it to be heard late in the proceedings, and ultimately during the trial itself, would exalt form over substance, promote inefficiency, and ultimately reward Letantia and Todd for their continually unredeemable behavior.

Obviously, it would have been better if Letantia and Todd had complied with their discovery obligations promptly—or at least promptly *after the court ordered them to do to so*—but they did not. Despite Reedy's repeated efforts, and pleas to the court, Letantia and Todd kept delaying, and the court kept giving them the benefit of the doubt—right until the time for trial.

And it would have been nice if Letantia and Todd had fulfilled their obligations in connection with the pretrial issues conference, but they did not. And it would have been nice if they had heeded the court's repeated warnings once the trial was underway, but they did not do that either. Now the piper has demanded payment, and their continued disregard for their obligations as

litigants simply cannot be spun into a reason for immunizing them from the consequences of that conduct.

We also reject Letantia and Todd's third contention, that the motions in limine were actually disguised motions for reconsideration of Reedy's prior sanction motions, without complying with the requirements of Code of Civil Procedure section 1008. Although it is true that Reedy had previously requested terminating sanctions against Letantia and Todd—and those initial requests were denied—the final motion she brought shortly before trial, and then the in limine motions brought in connection with the trial itself, did not seek *reconsideration* of those prior denials. The later motions were based on Letantia's and Todd's additional conduct, which occurred *after* the court's earlier rulings. Although the court was being asked to consider this new misconduct against the backdrop of their prior actions, the motion was not merely a rehash of that past argument. Consequently it did not trigger the requirements of Code of Civil Procedure section 1008. (*Andrus v. Estrada* (1995) 39 Cal.App.4th 1030, 1042–1043 [46 Cal.Rptr.2d 300] ["The court's ultimate grant of sanctions was based upon appellants' entire pattern of conduct over the course of the litigation. The court of the eastern division was entitled to consider appellants' earlier behavior, even though the court of the southern division had found the behavior exhibited up to that point did not merit sanctions."].)

## II

Letantia and Todd next argue that terminating sanctions were unwarranted, because there was no substantial evidence they willfully violated any court orders, and the court failed to "expressly find that Appellants had violated [a] court order before imposing terminating sanctions." We must again disagree.

Initially, we note that willfulness is no longer a requirement for the imposition of discovery sanctions. (*Ghanooni v. Super Shuttle* (1993) 20 Cal.App.4th 256, 260 [24 Cal.Rptr.2d 501].) That requirement was dropped from Code of Civil Procedure former section 2023, subdivision (b), as part of the former Civil Discovery Act of 1986. (*Kohan v. Cohan* (1991) 229 Cal.App.3d 967, 971 [280 Cal.Rptr. 474].)

But in any event, the record in this case is replete with evidence of what could only be construed as willful misconduct. In February of 2004, the court ordered Letantia to turn over all the records and documents which her late husband, John, had generated or maintained in the course of his tenure as trustee of the trusts at issue in this case. She did not. And when Reedy made a motion for sanctions based upon that failure, Letantia actually argued she had a fiduciary duty to keep the documents—despite the court's express

directive—until the conclusion of the litigation. In September of 2004, the court ordered both Letantia and Todd to answer discovery without objections. They didn't. In fact, they offered no responses at all—on the specious basis that the court had imposed no specific deadline for their answers—until Reedy was forced to make an ex parte application to the court to impose one. Even then, the responses she finally got were saturated with objections. In September of 2004, Letantia was also ordered to appear for a second day of her deposition, which she never did. As these examples demonstrate, we are faced with abundant evidence of both willful misconduct and violations of court orders. Since there is no basis upon which anyone could conclude they were unaware of those orders and no other explanation suggest itself, we must construe their violations as willful.

As for the contention the court did not make any express findings in support of the sanction order, we will infer all necessary findings to support a judgment, so long as substantial evidence exists to support them. (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928 [76 Cal.Rptr.2d 866].) Moreover, as Reedy points out, the court did expressly state, in its decision denying Letantia and Todd's motion to vacate the defaults, that it considered their misconduct to have been willful.

### III

Letantia and Todd next assert the court's decision to impose terminating sanctions was an abuse of discretion, and "violated the fundamental policy of resolving cases on their merits." Again, we disagree. Indeed, this case seems to illustrate the old adage that "no good deed goes unpunished." In our view, the court bent over so far backward in its effort to ensure this case would proceed on the merits—to give Letantia and Todd every benefit of the doubt, and every opportunity to ultimately comply with their obligations—that they began to believe their conduct was somehow acceptable. So they just kept pushing.

██ Their final effort; i.e., the attempt to schedule *11* depositions in the week prior to recommencement of the trial in this case, coupled with the flatly and literally incredible assertion the discovery was suddenly being sought in connection with *other petitions not yet scheduled for trial*, was understandably the last straw.[9] In the face of such an effort, the court could neither continue giving Letantia and Todd the benefit of the doubt, nor could it reasonably assume that some lesser sanction (such as additional monetary penalties) would be sufficient to curb their continued abuses.

---

[9] Keep in mind, these were parties who had insisted they could not be ready for the August trial date because they had to prepare for *another* lawsuit, a quiet title action whose trial date was approaching.

"The court's discretion to impose discovery sanctions is broad, subject to reversal only for manifest abuse exceeding the bounds of reason." (*American Home Assurance Co. v. Société Commerciale Toutélectric* (2002) 104 Cal.App.4th 406, 435 [128 Cal.Rptr.2d 430]; see *Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 388 [97 Cal.Rptr.2d 12]; *Vallbona v. Springer* (1996) 43 Cal.App.4th 1525, 1545 [51 Cal.Rptr.2d 311].) The circumstances of this case do not demonstrate such an abuse. The record here demonstrates the Bussells were recalcitrant in virtually every aspect of discovery, and failed to either produce documents or provide proper written answers to discovery. Letantia did not complete her deposition as ordered by the court, and Todd did not appear for trial, despite a notice requiring him to do so. Their obstinacy continued during trial.

Of course, Letantia and Todd contend on appeal that the court could have "better tailore[d] the sanctions to 'fit the crime,' " and we generally agree that such an effort should be made. (See, e.g., *Wilson v. Jefferson* (1985) 163 Cal.App.3d 952 [210 Cal.Rptr. 464].) However, this was not a case, like *Wilson,* in which the discovery violation was limited to a single request for production of documents, which focused on one specific factual contention. In this case, Letantia's and Todd's obduracy was plenary. Moreover, they make no effort on appeal to suggest exactly how the court might properly have tailored its sanction order to more properly fit their "crime," nor why we should conclude that such a sanction would have been effective. We find no abuse of the court's discretion. Indeed, we marvel at its forebearance.

IV

■ Letantia and Todd also assert that the court erred in granting a quiet title judgment regarding the "ranch" property, despite the fact Todd had expressly withdrawn that claim from the case. They are wrong: The court issued no such judgment in this case. A quiet title action is a specific statutory proceeding in which the court takes "complete jurisdiction" over the property (Code Civ. Proc., § 760.040, subd. (b)), and pursuant to specified procedures renders a judgment which binds all persons, known or unknown, who claim any legal or equitable interest in the property. (Code Civ. Proc., § 764.030.) This was not such a proceeding.

Instead, what the court did in this case was merely determine, as between these parties, their relative percentages of ownership in the property. That determination was a necessary aspect of adjudicating Reedy's petition which sought a pro rata contribution from each of the parties for the losses associated with that property. There was no error in this regard.

## V

Finally, Todd asserts the court exceeded its jurisdiction in entering default judgments against him—in the amount of $64,730 in case No. A217515; and in the amount of $294,516 in case No. A219334—because the petitions in neither case specified a particular amount of damages against him. To this we must—finally—assent.

Neither of Reedy's two petitions cited by Todd reflects even a ballpark estimate of the damages he is alleged to have caused, let alone a specific amount. Reedy's petition in case No. A217515 alleges that Todd improperly caused the sale of stock owned by Helen's initial trust, using an access number that had been issued to his late father, John. That sale allegedly resulted in "a long term capital gain of $227,620.27," and the petition consequently seeks "damages . . . as determined by proof." Reedy's petition in case No. A219334 alleges that Todd, again using the access number belonging to John, caused the sale of stock which resulted in "a long term capital gain of $1,097,000." That petition seeks "damages incurred as a result of the sale of securities." Presumably, Reedy is seeking to hold Todd liable for the *adverse tax effect* of those capital gains, but in neither case is that effect quantified.

It is well settled that the court cannot enter a default judgment in an amount greater than demanded in a complaint. (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 826 [231 Cal.Rptr. 220, 726 P.2d 1295]; *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.* (1984) 155 Cal.App.3d 381 [202 Cal.Rptr. 204].) That rule applies even if the default is entered as a result of discovery sanctions, rather than a failure to timely respond to the complaint. (*Greenup v. Rodman, supra,* 42 Cal.3d 822.)

However, as this court has previously concluded, the trial court may, in a case such as this where the complaint failed to specify the amount of damages sought, impose a more limited discovery sanction, which has the effect of precluding litigation of other aspects of the case, while leaving the parties to have a contested trial as to damages. (*Johnson v. Pratt & Whitney Canada, Inc.* (1994) 28 Cal.App.4th 613 [34 Cal.Rptr.2d 26].) In this case, Reedy consistently sought such evidentiary and issue sanctions, as an alternative to terminating sanctions, and we conclude that on remand, it would be appropriate for the court to reconsider whether such alternative sanctions against Todd would be appropriate in connection with petitions in case Nos. A217515 and A219334.

The judgment against Todd is reversed with respect to Reedy's petition in case Nos. A217515 and A219334, and those petitions are remanded with directions that the court reconsider whether more limited issue sanctions, relating to liability only, would be appropriate, and for further proceedings in accordance with that decision. The judgment is affirmed in all other respects. Reedy is to recover her costs on appeal.

Sills, P. J., and Fybel, J., concurred.

A petition for a rehearing was denied March 26, 2007, and appellants' petition for review by the Supreme Court was denied June 13, 2007, S152657.