Filed 6/5/15  Keszey v. Red Hawk Fire & Security CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PHILIP KESZEY, | B250812 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC421911) |
| v. | |
| RED HAWK FIRE & SECURITY (CA), LLC, | |
| Defendant and Respondent. | |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Jane L. Johnson, Judge.  Judgment and order affirmed.

The Lewis Law Firm, Anthony B. Lewis, Mario L. Grimm; Helmer Friedman and Andrew H. Friedman for Plaintiff and Appellant.

The Law Offices of Timothy B. McCaffrey, Jr., Timothy B. McCaffrey, Jr., and Natasha Chesler for Defendant and Respondent.

Philip Keszey worked for Detection Logic Fire Protection, Inc. (Detection Logic) as a salaried salesperson before and after its founder, Siamak Katal (Katal), sold the corporation.[1]  Keszey alleges that Detection Logic and Katal agreed to compensate him upon the sale of the corporation but failed to do so.  Keszey appeals a summary judgment in favor of Detection Logic and a postjudgment order awarding attorney fees under former Labor Code section 218.5.

Keszey's principal contentions on appeal are that conflicting extrinsic evidence concerning the existence and terms of his contract with Detection Logic precludes the summary adjudication of his count for breach of contract, and that the written contract properly interpreted in light of the extrinsic evidence obligated Detection Logic to compensate him upon the sale of its stock.  He also challenges the summary adjudication of other counts, the trial court's failure to deny the motion based on procedural defects in the moving papers, the overruling of his evidentiary objections, and the attorney fee award.

We conclude that Keszey has shown no prejudicial error. We therefore affirm both the judgment and the fee order.

### FACTUAL AND PROCEDURAL BACKGROUND

1.     *Factual Background*

Detection Logic installs and maintains fire alarms in commercial buildings. Katal founded the company in the mid-1990's.  He served as Detection Logic's president until 2007 and was its majority shareholder before the company was sold in December 2008.  His wife, Ingrid Katal, also worked for the company, initially answering phones and later as a manager and chief administrative officer.

Keszey has worked as a salesperson for Detection Logic since Katal first hired him in 1995.  Katal regarded Keszey as the company's best salesperson "by far."

---

[1]     Detection Logic changed its name and then converted from a corporation to a limited liability company, and is now known as Red Hawk Fire & Security (CA), LLC.  We will use the term Detection Logic to refer to both the former corporation and the current entity.

2

Detection Logic initially treated Keszey as an employee, but after a few years began to report part of his earned commissions on a W-2 form and the rest on a 1099 form. The purpose of reporting part of Keszey's income on a W-2 form was so he would be regarded as an employee and could continue to receive medical benefits.

Keszey formed Keszey Company in January 2003 to realize tax benefits. Detection Logic paid Keszey Company for Keszey's services. Keszey was an employee of and received income and a W-2 from Keszey Company. This arrangement continued until January 2009. Keszey earned approximately $380,000 in commissions in 2005.

In May 2006, Keszey and Katal discussed Keszey's compensation. There had been disputes about the calculation of his commissions, and Keszey wanted to simplify his pay structure. Katal sent Keszey an e-mail message on Monday, May 26, 2008, at 10:18 a.m., stating:

"As per our conversation with regards to your new pay schedule I am putting the following in writing in the hope that this will alleviate some of the problems that we are facing in the new business climate:

"1. Your pay will be a flat fee of $25,000.00 per month

"2. You would have a three weeks per year paid vacation as per company requirements and three sick days per year plus all normal holidays

"3. You would get my Lexus LS-430 put in your name, the company will pay you a car allowance equivalent to the payment for the vehicle. Once the vehicle is paid off the car allowance will revert to $750.00 per month.

"4. You would receive a one time payment of $25,000.00 to accommodate the past pay discrepancies

"5. You would continue your efforts in gaining account base and service the existing client base

"6. You would help other sales people with leads and sales support as needed.

"7. I will give you $500,000.00 of my Stock at the time of the sale of the business if you continue your efforts as you have been in the past and work with other sales people to promote the company business and profitability. Our profit goal for the

3

fiscal year 2006 is $12,000,000.00 in EBITDA your stock grant will be fully paid during any year when the sale of more than 50% of the company stock is accomplished and the profit forecast for the year is reached, your stock grant will be reduced by the percentage that the profit forecast is not reached (i.e. if we sell the business in 2006 and profit is $10,800,000.00 that is 10% lower than forecast your stock grant will be reduced by 10%). Please know that this is an incentive and it is to motivate you to continue having an interest in increasing the work load and helping others make this company more successful.

"The [] timing payout of your monthly stipend is between you and James, however, I suggest that you do not receive the same amount every month at the same time!

"If you agree with this, please come in on Tuesday and pick up a check for May/2006 pay (believe me it is more than your commission came up to – we) and wait one or two weeks for the one time payout."

Katal sent the message using his Detection Logic e-mail account to Keszey at Keszey's Detection Logic e-mail account. Keszey responded by sending Katal an e-mail message on May 29, 2006, at 10:54 a.m., stating:

"I will continue to work the way I do..

"Example; I am working today...on DLFP paperwork..

"Your agreement sounds good...

"But we agreet [*sic*] to 5 days sick pay...

"Also, I have been scheduled to go to New York Thursday and Friday... (then we start 3 weeks vacation agreement)

"Also, my May pay is actually Commission due from April..

"I am due for May payroll on last day of May...

"Can you please write memo...that you would like me to take over Lexus payment..with your signature..with account number / phone number...fax me a little note..I will see that maybe I can take over payment...(need your signature giving me permission to check it out)"

4

Keszey and Katal did not reach an agreement on the terms stated in the e-mail messages by May 30, 2006, and Keszey did not pick up a check that day. Instead, they continued to exchange e-mail correspondence. Keszey sent an e-mail message to Katal on May 31, 2006, with the subject line "You keep changing the deal!!!" Keszey stated that he should receive either a car maintenance allowance or a gasoline card and that he was still awaiting payment for past due commissions. He also stated that if he were to receive a certain percentage less upon the sale of the company if the company did not meet its profit goal, he should receive a certain percentage more if the company exceeded its profit goal.

Katal responded with an e-mail message to Keszey on May 31, 2006, stating that Keszey would receive more if the company exceeded its profit goal. Katal stated that Keszey could not receive both a car allowance and a car maintenance allowance or gasoline card. Katal also stated, "Phil I do not want to discuss this every day, if you wake up tomorrow morning and have another problem with the deal please cancel it and let's go back on our normal pay plan."

Keszey responded with another e-mail message to Katal on May 31, 2006, stating that his car maintenance should be included and that he should receive payment for previously agreed past due commissions, "and you know for a fact that this was not part of this deal." Keszey also stated, "I'm genuinely trying to be a team player…but I don't want you to take advantage of me."

Katal sent an e-mail message to Keszey on June 1, 2006, stating:

"Forget about the deal we made, I will finish the commission for April this weekend and try to push accounting to give me May ASAP. Thank you for trying to make a better deal for me, but it is not worth the headache. We go forward as we always had[.]"

Katal sent an e-mail to Keszey on June 12, 2006, stating:

"Thank you for a long and fruitful career at Detection Logic. I can only hope the best for you for whatever you do in the future. I apologize for not being able to deal with you anymore, this may be the best for both of us.

5

"Since you have already stopped working, I asked that you return all company owned equipment to myself by the end of the day today. All commissions due to you for all money received by Friday 06/09/06 will be calculated and sent to you no later than 06/30/06.

"Good luck and hope that you make much more money in whatever endeavor you engage in the future."

Ingrid Katal then called Keszey into her office and offered to "make peace" between her husband and Keszey. Keszey went to her office. She told him that she was going to speak with Katal, and then returned. Keszey could not recall the details of his conversation with her, but he testified in his deposition that she was trying to get him to agree to the terms of Katal's May 29 e-mail message. According to Keszey, he, Detection Logic, and Katal, through Ingrid Katal, agreed to the terms of Katal's May 29 e-mail message, as modified by Katal's e-mail message of May 31, in his meeting with Ingrid Katal on June 12, 2006.

Detection Logic paid Keszey a monthly salary of $25,000, in lieu of commissions, from June 2006 through December 2008. Detection Logic also paid him an additional $25,000 in June 2006 to resolve past pay discrepancies, and it paid $10,000 toward the purchase of Keszey's new Lexus in August 2006. In addition, Detection Logic paid Keszey a $750 monthly car allowance beginning in or about June 2006.

Detection Logic entered into a Phantom Stock Agreement with other employees providing for payments to the employees in accordance with a Phantom Stock Plan. The plan provided for a lump sum payment by Detection Logic to the plan participant upon the sale of the company. Keszey never signed a Phantom Stock Agreement.

Mustafa Colak became president of Detection Logic in early 2007. Another company bought Detection Logic in December 2008, and Colak became Detection Logic's regional general manager. Katal sold his shares of Detection Logic in connection with the sale of the corporation and left his employment with Detection

6

Logic. Keszey presented Katal's May 29 e-mail to Colak after the sale. Colak was not familiar with the e-mail and suggested that Keszey discuss it with Katal.[2]

In January 2009 Detection Logic gave Keszey a letter offering him employment as a sales manager beginning on January 1, 2009. The letter described his compensation and benefits. It stated, "This letter contains the entire offer to you and supersedes any other discussion you may have had with us. If you believe there were any other promises made to you that are not outlined in this letter, please advise me in writing prior to signing this letter." Keszey countersigned the letter in January 2009 without bringing up the change-in-control issue.

2. *The Complaint*

Keszey sued Detection Logic and Katal in September 2009. He alleges that Detection Logic and Katal agreed to compensate him according to the terms of Katal's e-mails dated May 29 and 31, 2006, and that the two e-mails constitute a written contract. He alleges he was an employee of Detection Logic at the time. He alleges that the stock sale in December 2008 was a sale of the business within the meaning of the contract, that he therefore is entitled to the agreed change-in-control compensation, and that that compensation constitutes wages. Keszey alleges that Detection Logic and Katal breached the contract by failing to pay the agreed change-in-control compensation. He also alleges that the defendants failed timely to pay other wages due under the contract.

Keszey alleges counts against Detection Logic and Katal for (1) failure to pay earned wages (Lab. Code, § 204); (2) breach of contract, based on the failure to pay change-in-control compensation; (3) breach of the covenant of good faith and fair dealing implied in that same contract; (4) quantum meruit; (5) unjust enrichment; (6) promissory estoppel; (7) promissory fraud; and (8) breach of contract, based on the failure to pay compensation due under the terms of the parties' prior agreement, alleged

---

[2]    Although Keszey testified he never sought change-in-control compensation from Detection Logic before filing his complaint, Colak testified that Keszey presented Katal's May 29 e-mail message to him after the sale of Detection Logic.

in the alternative.  He prays for damages, injunctive and equitable relief, statutory penalties, and attorney fees under Labor Code section 218.5.

      3.     *The Summary Judgment Motion*

Detection Logic moved for summary judgment or summary adjudication in January 2013.  It argued that Katal's May 29 e-mail was not an enforceable contract because the parties never reached a meeting of the minds and that Keszey, as an individual, was not a party to the alleged contract because he provided his services solely through Keszey Company.  It also argued that any contractual obligation to pay change-in-control compensation was personal to Katal and not binding on Detection Logic.  It argued further that Keszey's first count for unpaid wages had no merit because Keszey was not an employee and the change-in-control compensation was not wages.  Detection Logic made other arguments as well.  Detection Logic filed a declaration by its counsel, portions of deposition transcripts, and other documents in support of its motion.

Keszey argued in opposition that the moving papers were procedurally defective. He also argued that the parties had achieved a meeting of the minds and formed an enforceable contract, that he was a party to the alleged contract, and that the contract was binding on Detection Logic.  He argued that a meeting of the minds took place either (1) in his meeting with Katal preceding the May 29 e-mail; (2) through the May 29 and 31 e-mails; or (3) in his meeting with Ingrid Katal on June 12.  He argued further that he was an employee of Detection Logic and that the change-in-control compensation constituted wages .  Keszey filed his own declaration, declarations by his counsel, portions of deposition transcripts, and other documents in support of his opposition.

Detection Logic filed a reply together with a supplemental declaration by its counsel and additional exhibits.  The trial court allowed Keszey to file a sur-reply addressing the additional evidence submitted with the reply.

The trial court filed an order granting summary judgment on May 15, 2013.  The court declined to deny the motion based on discrepancies between the issues stated in

8

the notice of motion and those set forth in the separate statement of undisputed facts and other purported procedural defects. The court also ruled on evidentiary objections.

The trial court concluded that the offer to pay change-in-control compensation was made by Katal personally and was not made on behalf of Detection Logic. The court stated that Detection Logic therefore was entitled to summary adjudication of counts one through seven. The court also concluded that Keszey never accepted the offer, so no contract was formed. The court stated there was a triable issue of fact whether Keszey was an employee or an independent contractor, but Detection Logic could not be liable on the first count for unpaid wages in any event because any obligation to pay change-in-control compensation was Katal's personally.[3] Finally, the court concluded that the parties agreed to settle their dispute about past commissions for $25,000, Keszey accepted a one-time payment of $25,000 accordingly, and he agreed to payment of $25,000 per month moving forward and was paid that amount each month. The court stated that Detection Logic therefore was entitled to summary adjudication of the eighth count for breach of contract as well.

4. *The Judgment and Appeal*

The trial court entered judgment in favor of Detection Logic on June 26, 2013, including an award of attorney fees "per statute" in an unspecified amount.[4] Keszey timely appealed the judgment.

---

[3]     The trial court also stated the language in the January 2009 letter agreement quoted *ante* and Keszey's failure to claim in writing that Detection Logic owed him $500,000 "is not a waiver but an acknowledgement and further evidence that Keszey never considered the payment of the $500,000 to be Detection Logic's obligation."

[4]     The case proceeded to a jury trial against Katal, who apparently had left the country and did not appear at trial. The trial court entered a judgment on a special verdict awarding Keszey $694,000 in compensatory damages for unpaid wages and breach of contract and $3,500,000 in punitive damages based on fraud. Keszey moved for an attorney fee award under Labor Code section 218.5 as the prevailing party in an action for nonpayment of wages. The court granted the motion and awarded Keszey more than two million dollars in attorney fees.

9

5.    *The Attorney Fee Award and Appeal*

Detection Logic filed a motion for an attorney fee award under Labor Code section 218.5 in September 2013 seeking $468,592.50 in fees.  It argued that it was entitled to a fee award under the statute as the prevailing party in an action for unpaid wages.

Keszey opposed the fee motion arguing that Detection Logic had failed to show that he was an employee during the relevant time period and therefore failed to show that the change-in-control compensation constituted wages.  Keszey also argued that an employer was entitled to a fee award under the statute only if the employee brought the action in bad faith, and he did not bring this action in bad faith.  He requested judicial notice of a legislative committee analysis of a 2013 bill to amend Labor Code section 218.5.  The trial court granted the request for judicial notice.

The trial court concluded that the plain language of Labor Code section 218.5 mandated a fee award in favor of Detection Logic as the prevailing party because Keszey requested a fee award in his complaint.  It also concluded that the version of the statute in effect on November 1, 2013 -- the date of its ruling -- did not require a finding that the employee brought the action in bad faith.  The court therefore granted the fee motion and awarded Detection Logic $390,469.50 in fees in an order filed on November 1, 2013.  Keszey timely appealed the order.

## CONTENTIONS

Keszey contends (1) conflicting extrinsic evidence concerning the existence and terms of his contract with Detection Logic precludes the summary adjudication of his second count for breach of contract; (2) properly interpreted in light of the extrinsic evidence, Katal's May 29 e-mail message included a promise by Detection Logic to pay him change-in-control compensation; (3) the trial court erroneously granted summary judgment as to the eighth count based on its misunderstanding of the allegations; (4) procedural defects in Detection Logic's notice of motion and separate statement of undisputed facts preclude summary judgment, and the court improperly considered evidence presented for the first time with the reply; (5) the court erred by overruling his

evidentiary objections and drew improper inferences from the evidence; and
(6) Detection Logic is not entitled to an attorney fee award.[5]

## *DISCUSSION*

### 1.    *Standard of Review*

A defendant moving for summary judgment must show that an element of the plaintiff's cause of action cannot be established or that there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2).)  The defendant can satisfy its initial burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff does not possess and cannot reasonably expect to obtain evidence needed to establish an essential element.  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 (*Miller*).)  If the defendant meets this burden, the burden shifts to the plaintiff to present evidence creating a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2).)

We review the trial court's ruling on a summary judgment motion de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve all doubts concerning the evidence in favor of the opponent.  (*Miller*, *supra*, 36 Cal.4th at p. 460.)  We must affirm a summary judgment if it is correct on any of the grounds asserted in the trial court, regardless of the trial court's stated reasons.  (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181 (*Garrett*).)  Even if the grounds entitling the moving party to a summary judgment were not asserted in the trial court, we must affirm if the parties have had an adequate opportunity to address those

---

[5]     Keszey also contends the trial court's conclusion that Detection Logic never agreed to pay him change-in-control compensation does not negate any element of his fourth through seventh counts and therefore does not justify the summary adjudication of those counts.  He fails to discuss the elements of those counts, provides only a perfunctory argument in a single sentence, and cites no authority.  We therefore conclude that he abandons any claim of error as to those counts.  (*Valov v. Department of Motor Vehicles* (2005) 132 Cal.App.4th 1113, 1132; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.)

grounds on appeal. (*Ibid.*; see Gov. Code, § 68081; Code Civ. Proc., § 437c, subd. (m)(2).)

A different standard of review applies to the trial court's evidentiary rulings in connection with a summary judgment motion. We review those for abuse of discretion. (*Garrett*, *supra*, 214 Cal.App.4th at p. 181; *Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335.)

We review the trial court's ruling on a motion for attorney fees de novo to the extent that it turns on an issue of statutory construction. (*Kirby v. Immoos Fire Protection, Inc.* (2012) 53 Cal.4th 1244 (*Kirby*).)

2.      *Rules of Contract Interpretation*

Our goal in interpreting a contract is to give effect to the mutual intention of the contracting parties at the time of contract formation. (Civ. Code, § 1636.) We ascertain that intention solely from the written contract if possible, but also consider the circumstances under which it was made and the matter to which it relates. (*Id.*, §§ 1639, 1647.) We consider the contract as a whole and interpret its language in context giving effect to each provision, rather than interpret contractual language in isolation. (*Id.*, § 1641.) We interpret words in their ordinary and popular sense, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Id.*, § 1644.)

Extrinsic evidence is admissible to explain the meaning of a written contract provided that the contract is reasonably susceptible of the meaning supported by the extrinsic evidence.[6] (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343;

---

[6]      " '[E]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912 [75 Cal.Rptr.2d 573].) 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641], citing numerous authorities.)" (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391.)

*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 40.) We must interpret a written contract most strongly against the drafting party (Civ. Code, § 1654), but only if the other rules of interpretation and any extrinsic evidence do not resolve the ambiguity. (*Steller v. Sears, Roebuck & Co.* (2010) 189 Cal.App.4th 175, 183-184.)

3.       *There Is No Conflict in the Extrinsic Evidence Relating to Contract Interpretation and No Triable Issue of Fact in This Regard*

Keszey contends conflicting extrinsic evidence concerning the existence and terms of his contract with Detection Logic precludes summary adjudication of his second count for breach of contract. We disagree.

Contract interpretation is solely a judicial function unless the interpretation turns on the resolution of a factual dispute concerning the credibility of extrinsic evidence. (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 (*Parsons*).) This is true even if conflicting inferences can be drawn from the extrinsic evidence.[7] (*Garcia*, *supra*, at p. 439; *Parsons*, *supra*, at p. 866 & fn. 2.) Absent a factual dispute concerning the credibility of extrinsic evidence, the trial court interprets a contract in light of the extrinsic evidence and resolves any ambiguity. (*Legacy Vulcan Corp. v. Superior Court* (2010) 185 Cal.App.4th 677, 688; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126-1127 (*Wolf*).) In those circumstances, the Court of Appeal interprets the contract de novo in light of the extrinsic evidence. (*Parsons*, *supra*, 62 Cal.2d at pp. 865-866; *Wolf*, *supra*, at p. 1127.)

Thus, the interpretation of a contract is solely a judicial function unless the evidence creates a legitimate dispute as to the truth or falsity of a fact that is both extraneous to the contract and material to its interpretation. If the extrinsic evidence creates such a question of fact, the jury must decide that question before the contract can

---

[7]       *Parsons*, *supra*, 62 Cal.2d 861, equated conflicting inferences with conflicting interpretations. (*Id.* at p. 866, fn. 2 [" . . . conflicting inferences, actually conflicting interpretations . . . "].)

13

be interpreted. (*Wolf, supra*, 162 Cal.App.4th at p. 1127.) After the jury decides the facts, the interpretation of the contract either can be submitted to the jury or the court can interpret the contract in light of the jury's factual finding. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 396; see *Medical Operations Management, Inc. v. National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 892, fn. 4.)

There is no conflict in the evidence concerning the alleged written promise to pay change-in-control compensation and the surrounding circumstances relevant to its interpretation. The historical facts are undisputed. What Keszey describes as conflicts in the extrinsic evidence are actually conflicting inferences to be drawn from the undisputed facts. Contrary to Keszey's argument, his deposition testimony that he believed the alleged promise to pay change-in-control compensation was made on behalf of both Katal personally and Detection Logic does not create a triable issue of fact regarding contract interpretation. Absent any dispute as to the material facts, the interpretation of Katal's May 29 e-mail message is solely a question of law that properly should be decided by the trial court in ruling on the summary judgment motion.

4.     *Detection Logic Never Promised to Pay Change-in-Control Compensation*

Keszey contends Katal's May 29 e-mail message, properly interpreted in light of the extrinsic evidence, included a promise that Detection Logic would pay him change-in-control compensation. We disagree.

Katal's May 29 e-mail message to Keszey stated, in part:

"I will give you $500,000 of my Stock at the time of the sale of the business if you continue your efforts as you have been in the past and work with other sales people to promote the company business and profitability. Our profit goal for the fiscal year 2006 is $12,000,000.00 in EBITDA your stock grant will be fully paid during any year when the sale of more than 50% of the company stock is accomplished and the profit forecast for the year is reached, your stock grant will be reduced by the percentage that the profit forecast is not reached (i.e. if we sell the business in 2006 and profit is

14

$10,800,000.00 that is 10% lower than forecast your stock grant will be reduced by 10%). Please know that this is an incentive and it is to motivate you to continue having an interest in increasing the work load and helping others to make this company more successful."

The language "I will give you $500,000 of my Stock" reflects an offer by Katal personally rather than on behalf of Detection Logic. Katal's use of the words "I will" and "my Stock" rather than "The company will" and "its stock" shows his intention to create a personal obligation rather than a company obligation. Another paragraph in the message stated, "the company will pay you a car allowance." The two provisions considered together in the context of the message as a whole evidences an intention to distinguish Katal's personal obligations from those of Detection Logic, at least with respect to change-in-control compensation and a car allowance. This is true despite Katal's failure expressly to distinguish his personal obligations from those of the company with respect to other items, such as Keszey's monthly compensation ("Your pay will be a flat fee of $25,000.00 per month") and his one time payment for past commissions ("You would receive a one-time payment of $25,000.00 to accommodate the past pay discrepancies").[8]

The undisputed evidence shows that Keszey was highly valued as a salesperson and played an important role in the success of Detection Logic.[9] Katal as the majority shareholder of Detection Logic stood to gain from the company's success upon the sale of his shares in the company. Keszey's work for Detection Logic of course benefited the company, but it appears the primary benefit upon the sale of the company would be to Katal personally. There is no evidence that Detection Logic would benefit from the sale of the company. These circumstances suggest that Katal personally had good

---

[8]     Katal also referred to "my Lexus LS-430," but the owner was Detection Logic.

[9]     Katal was clearly enamored of Keszey's abilities as a salesperson. Katal said in his deposition that Keszey was "a hell of a salesman" and was the company's best salesperson "by far." Katal stated, "Phil Keszey, if he said 'hello' to someone, that was his customer. That was his attitude."

15

reason to offer Keszey a substantial monetary incentive to continue to work for Detection Logic until the company was sold.

Our consideration of deposition testimony by Keszey and Katal does not change our view. Keszey sometimes described the purported agreement to pay change-in-control compensation as an agreement with Katal. But he also stated that his agreement was with Detection Logic and Katal. He testified, "Well, the agreement I had with Detection Logic and Mack Katal was with Mack Katal, who was the president of Detection Logic. Okay? He is the one that had sold the company for X number of dollars, and he was the one that I was going to collect my money from." Regardless of any uncertainty in Keszey's understanding of the purported agreement, the objective facts -- including the language of Katal's May 29 e-mail message -- indicate that the offer to pay change-in-control compensation was made by Katal personally rather than Detection Logic.

Katal testified, "Change-of-control compensation, if it existed, it would have been either between me and Phil Keszey or Detection Logic and Phil Keszey. It would have nothing to do with Keszey Company." Katal also stated that if a court decided that Keszey was entitled to payment of $500,000, Katal personally should be responsible to pay.[10] Regardless of Katal's understanding of the nature of the purported agreement, the objective facts indicate that the offer to pay change-in-control compensation was made by Katal personally rather than Detection Logic.

Keszey cites Civil Code section 1659, which states, "Where all the parties who unite in a promise receive some benefit from the consideration, whether past or present, their promise is presumed to be joint and several." This statute concerns the distinction between a joint obligation, a several obligation, and a joint and several obligation. (See Civ. Code, §§ 1430, 1431.) We conclude that Detection Logic and Katal did not unite in a promise to pay change-in-control compensation within the meaning of the statute for the reasons we have stated, so the statutory presumption is inapplicable.

---

[10] Katal testified in deposition, "If a court decides that, this is my responsibility."

16

We conclude the trial court properly granted summary judgment in favor of Detection Logic on Keszey's second count for breach of contract based on the lack of any contractual obligation to pay change-in-control compensation.

5. *The Court Properly Granted Summary Judgment on the Eighth Count for Breach of Contract*

Keszey contends the trial court misunderstood the eighth count alleging a breach of his earlier agreement with Detection Logic for payment of commissions. He argues that, if the parties did not agree to the terms of Katal's May 29 and May 31 e-mail messages, his former compensation arrangement remained in place and Detection Logic breached that contract by failing to pay the agreed commissions. We disagree.

The undisputed evidence shows that Detection Logic paid Keszey $25,000 per month in lieu of commissions from June 2006 through December 2008. The evidence suggests the parties through their conduct agreed to replace the former compensation agreement based on commissions with a new compensation agreement based on a salary. Keszey presented no evidence to the contrary. (*DeLeon v. Verizon Wireless, LLC* (2012) 207 Cal.App.4th 800, 813-814 [mutual consent may be manifested by conduct].) We therefore conclude that Keszey has shown no error in the summary adjudication of his eighth count for breach of contract.

6. *The Court Properly Declined to Deny the Motion Based on Procedural Defects*

Keszey contends procedural defects in Detection Logic's summary judgment moving papers compelled the denial of the motion. He argues that two of the issues for summary adjudication set forth in the notice of motion failed to correspond with the issues set forth in Detection Logic's separate statement, and therefore failed properly to state the grounds for the motion, in violation of Code of Civil Procedure section 1010 and rules 3.1110(a) and 3.1350(b) of the California Rules of Court.[11]

---

[11]     All further unspecified rule references are to the California Rules of Court.

17

Code of Civil Procedure section 1010 states, in relevant part, that a notice of motion "must state when, and the grounds upon which it will be made, and the papers, if any, upon which it is to be based." Rule 3.1110(a) similarly states, "A notice of motion must state in the opening paragraph the nature of the order being sought and the grounds for issuance of the order." Detection Logic's notice of motion stated that the summary judgment motion was based on the grounds that there was no triable issue of fact with respect to any of the counts alleged against Detection Logic and that it was entitled to judgment as a matter of law. The notice also stated that Detection Logic was moving for summary adjudication in the alternative and listed eight issues for summary adjudication. The notice stated that the motion was based on the notice, a memorandum, declarations and exhibits, and "the pleadings and other documents on file with the Court."

Any defect in a notice of motion as to the grounds for the motion may be disregarded if other papers supporting the motion and identified in the notice show the grounds. (*Savage v. Smith* (1915) 170 Cal. 472, 474; *Carrasco v. Craft* (1985) 164 Cal.App.3d 796, 808.) Regardless of whether the notice of motion adequately stated the grounds, Detection Logic's memorandum supporting the motion explained the grounds for the motion. Keszey does not argue otherwise. We therefore conclude that the trial court properly disregarded any defect in the notice of motion.

Rule 3.1350(b) states, in relevant part, "If summary adjudication is sought, whether separately or as an alternative to the motion for summary judgment, the specific cause of action, affirmative defense, claims for damages, or issues of duty must be stated specifically in the notice of motion and be repeated, verbatim, in the separate statement of undisputed material facts." This requirement expressly pertains to motions for summary adjudication -- either separately or as an alternative to a summary judgment motion -- rather than summary judgment motions. The trial court here granted summary judgment, rendering the motion for summary adjudication moot. We therefore conclude that Keszey has shown no prejudicial error.

18

Keszey also argues that Detection Logic failed to highlight relevant portions of deposition testimony filed in support of its motion as required by rule 3.1116(c), failed to designate deposition testimony and the associated exhibits as a single exhibit as required by rule 3.1110(f), and failed to list in its separate statement all evidence cited in its memorandum. Procedural defects not affecting the substantial rights of the parties are not reversible error. (Code Civ. Proc., § 475; *Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1289.) Keszey has not shown that these purported deficiencies in the moving papers rendered them incomprehensible or otherwise prejudiced him. We therefore conclude that he has shown no reversible error.

Keszey argues further that Detection Logic improperly presented new arguments and new evidence in its reply. He argues that he countered those matters in his sur-reply while objecting to the improper argument and evidence, but the trial court overlooked the arguments in his sur-reply. We presume that the trial court performed its official duties absent a record showing to the contrary. (Evid. Code, § 664; *People v. Visciotti* (1992) 2 Cal.4th 1, 49.) We therefore presume that the court read and did not overlook any part of Keszey's sur-reply, and was not persuaded by the sur-reply. Keszey has shown no prejudicial error.

7.     *Keszey Has Shown No Prejudicial Error in the Overruling of Evidentiary Objections*

Keszey contends the trial court erred by overruling his evidentiary objections to his own deposition testimony submitted by Detection Logic. The testimony concerns Keszey's seeking payment from Katal of change-in-control compensation. Keszey contends the court improperly admitted the testimony, drew improper inferences from the testimony, and disregarded his corrections to the deposition transcript. We have not relied on any of the challenged testimony in reaching our conclusion that Katal made the offer to pay change-in-control compensation on his own personal behalf and not on behalf of Detection Logic. Keszey's claims of error regarding the admission of testimony therefore are moot.

19

Keszey also challenges the overruling of his evidentiary objection to the January 2009 employment agreement and the trial court's conclusion as to the significance of the agreement. Even if the language in the employment agreement quoted *ante* were not an acknowledgment that Detection Logic had no obligation to pay change-in-control compensation, any error on this point was harmless. The record supports our conclusion that Detection Logic never offered to pay change-in-control compensation without reference to the January 2009 employment agreement. Keszey therefore has shown no prejudicial error.

8. *Keszey Has Shown No Error in the Attorney Fee Award*

a. *The Court Was Not Required to Find That Keszey Was an Employee Before Awarding Fees*

Keszey contends the trial court erred by awarding Detection Logic attorney fees under Labor Code section 218.5 without determining that he was an employee during the relevant time period and that the change-in-control compensation actually constituted wages.

At the time of the fee award in November 2013, Labor Code section 218.5 stated:

"In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action. This section shall not apply to an action brought by the Labor Commissioner. . . .

"This section does not apply to any action for which attorney's fees are recoverable under Section 1194." (Stats. 2010, ch. 697, § 42.)

A statutory amendment effective on January 1, 2014 (Gov. Code, § 9600, subd. (a)), added the following language after the first sentence: "However, if the prevailing party in the court action is not an employee, attorney's fees and costs shall be awarded pursuant to this section only if the court finds that the employee brought the court action in bad faith." (Stats. 2013, ch. 142, § 1.) The amendment also added subdivision designations. (*Ibid.*)

20

"Our fundamental task in construing a statute is to ascertain the legislative intent so as to effectuate the purpose of the law. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726].) Because the statutory language ordinarily is the most reliable indicator of legislative intent, we begin by examining the words of the statute. (*Ibid.*) We give the words of the statute their ordinary and usual meaning and construe them in the context of the statute as a whole and the entire scheme of law of which it is a part. (*State Farm Mutual Automobile Ins. Co. v. Garamendi* (2004) 32 Cal.4th 1029, 1043 [12 Cal.Rptr.3d 343, 88 P.3d 71].) If the language is clear and a literal construction would not result in absurd consequences that the Legislature did not intend, we presume that the Legislature meant what it said and the plain meaning governs. (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 [21 Cal.Rptr.3d 676, 101 P.3d 563].) If the language is ambiguous, we may consider a variety of extrinsic aids, including the purpose of the statute, legislative history, and public policy. (*Ibid.*)" (*Frontier Oil Corp. v. RLI Ins. Co.* (2007) 153 Cal.App.4th 1436, 1448-1449.)

Labor Code section 218.5 provides for an attorney fee award in an "action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions." (*Id.*, subd. (a).) The California Supreme Court in *Kirby*, *supra*, 53 Cal.4th 1244, explained that this language means "an action brought *on account of* nonpayment of wages."[12] (*Id.* at p. 1256.) *Kirby* held that an action under Labor Code section 226.7 for the alleged failure to provide meal or rest breaks is not an "action brought for the nonpayment of wages" within the meaning of section 218.5 because the gravamen of an action under section 226.7 is the failure to provide meal or rest breaks rather than the failure to pay wages. (*Kirby*, *supra*, at pp. 1256-1257.) *Kirby* stated the fact that the statutory remedy for a section 226.7 violation is additional wages (*id.*,

---

[12]     *Kirby*, *supra*, 53 Cal.4th at pages 1257-1258, also stated that the legislative history suggested "the Legislature intended 'action[s] brought for the nonpayment of wages' to refer to suits where the allegedly unlawful conduct is the employer's failure to comply with an obligation to pay wages or benefits."

21

§ 226.7, subd. (b); *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1102, 1114) does not mean that an action for failure to provide meal or rest breaks is an action for nonpayment of wages. (*Kirby*, *supra*, at p. 1157.)

*Kirby* explained that the gravamen of an action -- rather than the nature of the relief sought -- determines whether it was "brought for the nonpayment of wages" within the meaning of Labor Code section 218.5, subdivision (a). (*Kirby*, *supra*, 53 Cal.4th at pp. 1156-1158.) If the gravamen of an action is the failure to pay wages to an employee, the action was brought for the nonpayment of wages within the meaning of the statute. (*Ibid.*) An action in which the plaintiff expressly alleges that he was an employee and that his employer failed to pay wages earned and seeks damages for nonpayment of wages, as here, is an action brought for the nonpayment of wages within the meaning of the statute. Contrary to Keszey's argument, *Kirby* did not hold or suggest that a court must determine that a plaintiff actually was an employee as alleged before awarding attorney fees in such an action. The statutory language also does not suggest that a court must make such a determination before awarding fees. We conclude Keszey has shown no error.

      b.     *The Court Was Not Required to Find that Keszey Brought the Action in Bad Faith Before Awarding Fees*

Keszey also contends an employer seeking a fee award under the version of Labor Code section 218.5 in effect in November 2013, before the recent statutory amendment, was required to show that the employee brought the action in bad faith. Citing the legislative history, he argues that the amendment merely clarified existing law and did not change the law.

Whether a statute merely clarifies, rather than changes, existing law is a question for the courts to decide. (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 472-473.) Absent a definitive interpretation of existing law by the courts, the Legislature's declaration as to what an earlier Legislature intended is entitled to consideration, but is not binding on the courts. (*Id.* at p. 473.)

The plain language of former Labor Code section 218.5 said the prevailing party in any action for the nonpayment of wages or other benefits was entitled to an attorney fee award whether the prevailing party was an employee or an employer. The operative language stated, "In any action brought for the nonpayment of wages, fringe benefits, or health and welfare or pension fund contributions, the court shall award reasonable attorney's fees and costs to the prevailing party if any party to the action requests attorney's fees and costs upon the initiation of the action."[13] This language did not distinguish a prevailing employee from a prevailing employer or suggest that a different standard applied to each.

The California Supreme Court in *Kirby*, *supra*, 53 Cal.4th at page 1248, construed former Labor Code section 218.5 as a two-way fee-shifting statute applicable to both employees and employers. *Kirby* stated, "This provision awards fees to the prevailing party whether it is the employee or the employer; it is a two-way fee-shifting provision." (*Ibid.*) *Kirby* also said, "Section 218.5 is a two-way fee-shifting statute, permitting an award of fees to either employees or employers who, as relevant here, prevail on an 'action brought for the nonpayment of wages.' " (*Id.* at p. 1251.) *Kirby* contrasted the two-way fee-shifting provision in former Labor Code section 218.5 with the one-way fee-shifting provision in Labor Code section 1194, which authorizes a fee award in favor of only an employee who prevails in an action for unpaid minimum wage or overtime compensation. (*Kirby*, *supra*, at p. 1248.) But *Kirby* did not discuss whether an employer seeking fees under the statute must show that the employee brought the action in bad faith.

---

[13]      This language is unchanged in current Labor Code section 218.5, subdivision (a). As stated *ante*, new language in the current statute reads, "However, if the prevailing party in the court action is not an employee, attorney's fees and costs shall be awarded pursuant to this section only if the court finds that the employee brought the court action in bad faith." (*Ibid.*)

Keszey cites an analysis by the Assembly Committee on Judiciary of Senate Bill No. 462 (2013-2014 Reg. Sess.) as introduced on February 21, 2013. The analysis stated:

"According to the author, the bill enacting section 218.5 was 'intended to cover the cost of obtaining wages and benefits from recalcitrant or slow paying employers.' (Ass. Comm., SB 2570, as amended Jun 17, 1986.) According to the author, 'the Legislature explicitly included the word [']frivolous' in describing how employers would be able to recover attorney's fees under 218.5. Thus, the most reasonable construction of section 218.5 is that the two-way fee provision should apply only when employers defeat frivolous claims. . . . ' "

This committee analysis refers to the legislative history of the prior bill that enacted Labor Code section 218.5, but is not itself part of the legislative history of the prior bill. We have granted Detection Logic's request for judicial notice of materials from the legislative history of the prior bill. (Evid. Code, §§ 452, subd. (c), 459; *Watkins v. County of Alameda* (2009) 177 Cal.App.4th 320, 332, fn. 12.) Consistent with the language of former Labor Code section 218.5, those materials suggest that the Legislature enacting the bill in 1986 did not intend to limit a fee award against an employee to circumstances where the employee's action was frivolous.

Several committee analyses, including an analysis by the Senate Rules Committee, stated that one of the arguments in support of the bill was that "employers will be protected from frivolous lawsuits for nonpayment of wages since the employee will be required to pay the employer's legal fees when the employer is the prevailing party." (Sen. Rules Com., Analysis of Sen. Bill No. 2570 (1985-1986 Reg. Sess.) as amended Aug. 14, 1986 [*sic*], p. 2.) This statement suggests that the Legislature considered the argument that the bill would discourage frivolous employee lawsuits, but does not mean the Legislature understood or intended that the bill would authorize a fee award against an employee only if the action was frivolous.

The bill enacting Labor Code section 218.5 also added language to Labor Code section 1128, subdivision (c) requiring an attorney fee award to the prevailing party in

24

an action to compel compliance with an arbitration award in a dispute involving a collective bargaining agreement, "unless the other party has raised substantial issues involving complex or significant questions of law." (Stats. 1986, ch. 1211, p. 4290.) But no similar language was included in the bill as to new Labor Code section 218.5. A committee analysis said of this provision, "This provision is designed to deter frivolous claims or defenses since the fees may not be awarded where the losing party has raised substantial issues involving complex or significant questions of law." (Assem. Com. on Jud., Analysis of Sen. Bill No. 2570 (1985-1986 Reg. Sess.) as amended Aug. 12, 1986, p. 2.) The absence of similar language in the same bill as to new Labor Code section 218.5 suggests the Legislature did not intend to impose a similar limit on a fee award to the prevailing party under section 218.5, whether the prevailing party is an employee or an employer.

We conclude that former Labor Code section 218.5 did not require a prevailing employer to show that an employee brought the action in bad faith in order to justify an award of attorney fees against the employee. The statutory amendment that took effect on January 1, 2014, changed the law on this point and did not merely clarify existing law. We therefore conclude the trial court properly awarded fees in favor of Detection Logic under the statute.

## DISPOSITION

The judgment and the order awarding attorney fees are affirmed. Detection Logic is entitled to recover its costs on appeal.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.*

WE CONCUR:

KITCHING, J., Acting P. J.

ALDRICH, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.