Filed 6/29/26  Team Makena v. Lasso CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| TEAM MAKENA, LLC et al., | |
| Plaintiffs, Cross-Defendants, and Respondents, | G062790, G064025 |
| v. | (Super. Ct. No. 30-2016-00884951) |
| JOHN LASSO, | O P I N I O N |
| Defendant, Cross-Complainant, and Appellant, | |
| SPARTAMED, LLC, | |
| Defendant and Appellant, and | |
| JNL CONSULTING SERVICES, INC., | |
| Cross-Complainant and Appellant. | |

Appeal from a judgment and orders of the Superior Court of Orange County, Randall J. Sherman, Judge. Affirmed in part, reversed in part, and remanded with directions.

Kowal Law Group and Timothy M. Kowal; Brownstone Law Group and Thomas A. Moore for Defendant, Cross-Complainant and Appellant John Lasso, Defendant and Appellant SpartaMed, LLC, and Cross-Complainant and Appellant JNL Consulting Services, Inc.

Call & Jensen, Scott R. Hatch and Joshua G. Simon for Plaintiff, Cross-Defendant, and Respondent Össur Americas, Inc. and Cross-Defendants and Respondents Otto Fernandez, Mark Tymchenko, Olafur Gylfason, Christian Robinson, and Jon Sigurdsson.

Shields Law Offices, Jeffrey W. Shields and Rick A. Varner for Plaintiff, Cross-Defendant, and Respondent Team Makena, LLC.

\*　　　\*　　　\*

These consolidated appeals raise four issues, one concerning liability and three concerning damages.

First, defendant and cross-complainant John Lasso, defendant SpartaMed, LLC, and cross-complainant JNL Consulting Services, Inc. appeal from a discovery sanctions order deeming defendants Lasso and SpartaMed liable on the complaint and striking Lasso's and JNL's cross-complaint. They contend insufficient evidence showed they engaged in discovery abuse.

Second, both defendants appeal from the ensuing judgment for plaintiffs Team Makena, LLC and Össur Americas, Inc., contending the trial court wrongly excluded their "mitigation" evidence from the damages phase.

Third, Lasso appeals from the $10 million punitive damages award. He asserts insufficient evidence showed his financial condition, and in

any event, the award was too high a percentage of his net worth as a matter of law.

Fourth, defendants maintain the court wrongly denied their postverdict request for an offset based on plaintiffs' pretrial settlement with another party.

On the first three issues, we affirm the trial court. Ample evidence showed defendants repeatedly deleted, destroyed, and suppressed critical evidence during discovery. The "mitigation" evidence supported defendants' unviable contention that corporate officers are free to compete with their own companies if they simply say they will, and thus was correctly excluded. And the punitive damages award was sufficiently supported and not excessive.

On the fourth issue, we reverse and remand only to allow the trial court to expressly consider defendants' offset request.

FACTS[1]

I.

THE PARTIES AND THEIR DISPUTE

---

[1] The record in this case is over 27,000 pages long, yet appellants repeatedly cite to themselves (their trial brief, their opening statement) and not to evidence. This is improper and exceedingly unhelpful. (See Cal. Rules of Court, rule 8.204(a)(1)(C) & (a)(2)(C) [record references required]; *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590 (*Alki*) ["Citing points and authorities filed in the trial court is not appropriate support for factual assertions in a brief"]; *Cardenas v. Los Angeles Unified School District* (2026) 120 Cal.App.5th 554, 556 [pages cited from trial brief "are just three pages of something [appellant's] lawyer wrote in the past"].) We decline to consider appellants' unsupported factual assertions. (See *Alki,* at p. 590, fn. 8.)

Lasso and others formed Team Makena in 2007. The company fills orthotic and prosthetic prescriptions for durable medical equipment (DME), such as braces and deep vein thrombosis devices, and handles the billing for those products. Lasso served as Team Makena's president.

Össur, which manufactures DME, acquired a majority interest in Team Makena in 2009. Following the Össur acquisition, Team Makena became the exclusive distributor and biller of certain Össur products in California and neighboring states, and it agreed to use its best efforts to promote Össur products.

Lasso continued on as president of Team Makena and maintained a minority interest in it through his wholly owned company, JNL. As president, Lasso owed fiduciary duties to Team Makena and was prohibited from working for its competitors or engaging in work that created a conflict of interest. According to Össur and Team Makena, however, Lasso breached those obligations in multiple ways.

First, Lasso incurred large personal expenses at Team Makena's expense, engaged in self-dealing by redirecting Team Makena commissions to himself, and exaggerated Team Makena's profits so he could collect distribution payments.

Second, in 2015, Lasso and Team Makena sales representative Trevor Theriot formed their own DME company, ManaMed, Inc. They used it to develop a deep vein thrombosis device that Lasso created. Although Lasso at one point asked Össur if it would be interested in developing the device, Össur passed, and Lasso transferred ownership first to another company he created—TryABrace—and then to ManaMed. The device, known as PlasmaFlow, later became ManaMed's bestselling product.

4

Third, in 2016, Lasso and Theriot began meeting with Breg, Inc., another DME manufacturer and biller, about serving as an independent sales representative for Breg products. As a DME manufacturer, Breg competed with Össur, and as a DME biller, Breg competed with Team Makena.

## II.

### LITIGATION ENSUES;

### LASSO IS TERMINATED AND CREATES SPARTAMED

In May 2016, counsel for Össur and Team Makena sent a letter to Lasso advising him of their potential claims against him and reminding him of his duty to preserve evidence, including electronic records.

In November 2016, Össur and Team Makena filed a complaint against Lasso, ManaMed, and another person, asserting claims including breach of fiduciary duty. Team Makena also filed a separate complaint against Lasso and ManaMed.

A week later, Team Makena terminated Lasso for his alleged disloyalty. Össur then exercised its right under the Team Makena operating agreement to purchase JNL's interest in the company, triggering a non-competition clause.

Meanwhile, Lasso and Theriot's efforts to represent Breg's products culminated in their formation of SpartaMed. SpartaMed entered into an Independent Sales Representative (ISR) Agreement with Breg effective January 1, 2017, and in the weeks that followed, SpartaMed took customers and recruited personnel from Team Makena.

Later that month, Team Makena and Össur obtained a temporary restraining order against Lasso and ManaMed, preventing them from soliciting Team Makena sales representatives and customers and from using its confidential business information.

5

Meanwhile, Lasso filed a cross-complaint against Össur, Team Makena, and others. He accused Össur of "cannibalizing" Team Makena (as he puts it in his appellate brief) and wrongfully ousting him, alleging causes of action including breach of contract and derivative claims purportedly on behalf of Team Makena.

In February 2017, the trial court issued a preliminary injunction against Lasso and ManaMed prohibiting their solicitation of Team Makena sales representatives and customers. Because of the preliminary injunction, Lasso disassociated from SpartaMed shortly thereafter. Össur and Team Makena would later amend their complaints to add SpartaMed as a defendant.

## III.

### DISCOVERY ABUSES

The trial court entered a stipulated order concerning discovery and the production of electronically stored information in 2018; this court-ordered ESI protocol governed the manner in which ESI was to be produced. The court also eventually appointed a discovery referee.

Discovery went far from smoothly, however. Extensive motion practice and court orders were required to secure adequate discovery responses from defendants. For example, the trial court granted Össur's motion to compel Lasso's deposition. It also granted Össur's numerous motions to compel SpartaMed to provide discovery responses and produce responsive documents, collectively imposing over $13,000 in sanctions against SpartaMed and its counsel.[2]

---

[2] The trial court also granted two motions by Össur to compel discovery responses from ManaMed, collectively imposing over $10,000 in sanctions against ManaMed and its counsel; and it imposed $4,180 in

6

During the course of discovery, plaintiffs' counsel also uncovered a series of misrepresentations and omissions in Lasso's and SpartaMed's discovery responses and document productions. For example, SpartaMed was not entirely accurate when it responded that all communications and documents relating to contracts with Breg were no longer in its possession, custody, or control because they had been returned to Breg in January 2020 as required by contract. It was true that the ISR Agreement between Breg and SpartaMed required SpartaMed to return all confidential information to Breg upon the agreement's termination and to not keep any copies. It was also true that SpartaMed had returned about 60,000 documents to Breg in early 2020 at Breg's request. What SpartaMed failed to disclose at the time, however, was that its counsel and its forensics provider had retained copies of the documents given to Breg—meaning SpartaMed *did* have responsive documents in its control yet did not produce them.

The next discovery controversy began in 2021 when plaintiffs noticed that Lasso, ManaMed, and SpartaMed had failed to produce key e-mails that undeniably existed and should have been in their possession. Breg had previously produced e-mails exchanged between Breg personnel, Lasso, and Theriot in 2016 and early 2017 when Lasso and Theriot were developing SpartaMed. Of particular importance were 34 e-mails concerning Lasso's and Theriot's meetings with Breg and their plans to bring over a book of business and become Breg's Orange County distributor. According to Össur's counsel, these 34 e-mails were "crucial" to plaintiffs' claims, and they served as key exhibits at Lasso's deposition.

---

sanctions against ManaMed for bringing an unjustified motion to compel against Össur.

After the deposition, Össur's counsel noticed that Lasso, ManaMed, and SpartaMed had failed to produce those same 34 e-mails. This was surprising because Össur's document requests to them encompassed those communications.

When the missing e-mails triggered concerns, Össur's counsel reviewed documents produced by another third party, Whitney Reynolds—a former Team Makena sales representative who left with Lasso for a similar role at SpartaMed. Reynolds had produced 12 e-mails, 11 of which should have been included in defendants' document production, and six of which included Lasso personally. Defendants had not produced a single one of those 11 e-mails.

Össur served discovery on Lasso, ManaMed, and SpartaMed, asking them to admit they had not produced the 34 Breg e-mails and to explain why not. In response, they confirmed in February 2022 that they had never produced the e-mails and asserted they had returned all potentially confidential documents to Breg in late 2019 or early 2020 pursuant to the ISR Agreement between Breg and SpartaMed.

SpartaMed then disclosed that the forensic company which had gathered its records for Breg in 2020 had retained a copy of those documents on a thumb drive. Additional meet and confer efforts with plaintiffs ensued, as well as discussions with the discovery referee. SpartaMed ultimately agreed to produce the 60,000 or so documents it had given to Breg in early 2020.

After those documents were uploaded into their document management system in June 2022, plaintiffs' counsel discovered a number of unexpected things. First, most of the 60,000 documents that SpartaMed had transferred to Breg had nothing to do with Breg. According to plaintiffs, this

suggested that SpartaMed had intentionally transferred those documents to Breg to avoid producing them in discovery.

Second, to plaintiffs' surprise, the documents contained *none* of the 34 Breg e-mails, and only one of the 11 Reynolds e-mails. From this, plaintiffs drew two conclusions: (1) defendants had falsely claimed in their discovery responses that the reason they had not produced the 34 Breg e-mails was because they had been returned to Breg, when in fact they had not, and (2) defendants' failure to produce those e-mails (which were clearly sent, as confirmed by Breg's and Reynolds' productions) meant defendants had either destroyed their records of those crucial documents or wrongfully withheld them.

Finally, the 60,000 or so documents did not contain any e-mails from before May 2017, and thus were missing e-mails from the key period of 2016 to early 2017 when Lasso and Theriot were setting up SpartaMed. According to plaintiffs, this further suggested that defendants had either deleted those e-mails or otherwise suppressed them.

IV.

THE SANCTIONS MOTION AND THE FORENSIC EXAMINATION

Össur and Team Makena filed a motion for terminating, issue, and evidentiary sanctions. They cited defendants' spoliation of the 34 Breg e-mails and the 11 Reynolds e-mails and their destruction or intentional withholding of SpartaMed's communications from before May 2017. As they put it in their motion, "Accidents happen in document productions, but 0-for-34 and 0-for-11 is not an accident." Lasso and SpartaMed filed a cursory opposition, offering no explanation for why the 34 e-mails were produced by Breg but not Lasso—they responded, "Who knows why"—and insisting that

9

"no spoliation has occurred" because plaintiffs were able to obtain the documents from Breg.

The trial court assigned the motion to the discovery referee, who recommended monetary sanctions based on SpartaMed's repeated discovery violations. She noted SpartaMed had provided "misleading" verified discovery responses and failed to produce responsive documents in its possession. However, she declined to recommend terminating sanctions, as she was not yet "persuaded" that SpartaMed and Lasso "spoliated evidence."[3] Citing the imminent trial date, which was less than a week away, the referee noted she was hesitant to recommend an independent forensic examination to determine if SpartaMed or Lasso had deleted or double-deleted[4] documents from their devices, but added that the court had discretion to order such an examination.

Days later, plaintiffs settled with ManaMed. The trial court then continued trial given the ongoing discovery disputes and ordered the parties to meet and confer about a forensic examination. Meanwhile, Lasso amended his cross-complaint to add his wholly owned company, JNL, as a cross-complainant, after concerns arose about whether he lacked standing to pursue certain claims. In doing so, Lasso assured the court that he "and JNL

---

[3] We do not read the discovery referee's report as affirmatively finding that no evidence had been destroyed or suppressed, as Lasso, JNL, and SpartaMed assert. She instead appears to have believed that spoliation remained an open question, with only "an inadequate basis in the record . . . for issuing terminating sanctions at this time."

[4] Double deletion is when a file is deleted in a manner that makes forensic recovery more difficult or impossible, such as by first sending the file to the recycle bin (single deletion) and then emptying the recycle bin (double deletion).

are pursuing the same damages for the same acts of Cross-Defendants on the same legal basis."

With the discovery referee's assistance, the parties eventually stipulated to a forensic protocol order. Michael Garlie was appointed to conduct a forensic examination of Lasso's and SpartaMed's e-mail accounts, computers, phones, and other electronic devices. In particular, he was tasked with determining (1) if any documents were "deleted or otherwise destroyed," and (2) if the 34 Breg e-mails and 11 Reynolds e-mails were still located on any devices or in any e-mail accounts.

Garlie conducted a forensic examination of five Apple iPhones, four Apple computers, a Dell desktop, a Surface Pro laptop with a Samsung solid state drive, three e-mail accounts, and two flash drives. He then issued a lengthy report in January 2023, with individual reports on each device and e-mail account.

Garlie began by noting that recovering deleted data from Apple mobile devices was "not expected" because of "Apple's privacy and security posture" and that "data deleted from devices using solid state drives ('SSD') is unlikely to be identified or recovered" because it is "quickly zero'd out by an automated process." But despite those limitations, which impacted a majority of the inspected devices, Garlie nevertheless found evidence that Lasso had deleted files and e-mails.

Since Garlie's report is over 11,000 pages long, we offer an example. Garlie's review of Lasso's desktop computer revealed that in April 2017—a few months after litigation began and long after plaintiffs asked him to preserve evidence—Lasso had deleted an entire folder entitled "ManaMed," which contained hundreds of documents and included subfolders on topics like "Distributor Contracts," "DVT Pitch Folder," "ManaMed

11

Invoices," and "PlasmaFlow."[5] That same month, Lasso had deleted another folder entitled "tryabrace_files," which contained dozens of documents presumably related to his development of PlasmaFlow.[6] And in November 2019—while discovery was well underway—Lasso had deleted his Outlook e-mail folder entitled "ManaMed Mail."[7]

As for the 45 unproduced e-mails (the 34 Breg e-mails and 11 Reynolds e-mails), Garlie located multiple copies of 36 of those e-mails in the devices he inspected—not in deleted folders or recycle bins, but in accessible locations. Additionally, he found three of the unproduced e-mails in other e-mail threads. He was unable to find the remaining six e-mails in any form. Based on this, plaintiffs concluded that defendants had (1) failed to produce dozens of responsive documents in their possession, custody, and control, and (2) deleted several responsive e-mails in a way that could not be tracked.

The trial court accepted supplemental briefing from the parties. Lasso's forensic examiner, Bruce Pixley, declared that "the majority of the data" described in Garlie's report was not in fact fully deleted but rather remained in accessible locations like recycle bins. Plaintiffs objected to Pixley's declaration on the grounds that he was never disclosed or designated

---

[5] According to Össur's counsel, defendants produced very few of the deleted ManaMed documents.

[6] Lasso transferred ownership of PlasmaFlow to TryABrace (another company he created) before transferring the rights to ManaMed.

[7] Garlie later submitted a declaration clarifying that although his report concerned deleted data, he did not determine "if the reported deleted files exist elsewhere, nor if deleted files were previously produced." He cautioned that "documents deleted from the devices may exist elsewhere."

yet was providing expert opinion on topics that the neutral examiner (Garlie) was appointed to cover.

After extensive oral argument, the trial court granted plaintiffs' sanctions motion. It found plaintiffs had "established a vast wholesale of destruction and deletion of evidence on a widespread scale and that it goes to the heart of plaintiffs' case," and it was therefore "appropriate to issue a sanction." The court then ordered that liability is "deemed established" on plaintiffs' complaints against Lasso and SpartaMed, and it struck Lasso's and JNL's cross-complaint. It further ordered that plaintiffs' damages would be decided by a jury.

V.

TRIAL ON DAMAGES AND POSTTRIAL MOTIONS

Trial on plaintiffs' damages went forward in December 2023. During those proceedings, the trial court did not let Lasso or SpartaMed introduce evidence that Lasso told Össur he was developing PlasmaFlow or that Össur passed on the opportunity to manufacture the device; according to the court, "that is not a legitimate mitigation-of-damages argument." The court also issued a four-page special jury instruction detailing the bases for defendants' liability.

After a multi-week trial, the jury returned a verdict for plaintiffs in excess of $40 million, which included $10 million in punitive damages against Lasso.[8] The trial court entered judgment on the verdict.

_____

[8] The jury awarded Team Makena $26,382,000 in damages against Lasso (of which $1,802,000 was against SpartaMed as well), plus $8,000,000 in punitive damages against Lasso. It awarded Össur $3,763,195 against Lasso (of which $877,195 was against SpartaMed as well), plus $2,000,000 in punitive damages against Lasso.

13

Lasso and SpartaMed filed motions for new trial (Code Civ. Proc.,[9] §§ 657, 659) and for judgment notwithstanding the verdict (JNOV) (§ 629). The trial court denied both motions.[10]

## DISCUSSION

## I.

### THE SANCTIONS ORDER WAS NOT AN ABUSE OF DISCRETION

Lasso, JNL, and SpartaMed maintain there is no evidence of "'vast'" or "'widespread'" destruction of documents so as to warrant sanctions. We cannot agree.

California law authorizes "a broad range of sanctions" against a party who fails to respond to discovery, provides evasive responses, destroys evidence in anticipation of discovery, or engages in any other conduct amounting to "'misuse of the discovery process.'" (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 12 (*Cedars-Sinai*); see §§ 2023.030 [authorizing sanctions], 2023.010 [defining discovery misuse].)[11]

A most egregious form of discovery abuse is spoliation, which is "the intentional destruction or suppression of evidence." (*R.S. Creative, Inc. v. Creative Cotton, Ltd.* (1999) 75 Cal.App.4th 486, 497 (*R.S. Creative*).)

---

[9] All further statutory references are to this code.

[10] We consolidated JNL's appeal from the sanctions order (No. G062790) with Lasso, JNL, and SpartaMed's appeal from the judgment and postjudgment order (No. G064025).

[11] Lasso's, JNL's, and SpartaMed's appeal seems to be largely premised on their assumption that sanctions are only appropriate if a party "actually destroyed" evidence. That is not what the Civil Discovery Act says. As discussed below, the failure to produce responsive documents, even if those documents were not actually destroyed, can warrant terminating sanctions if the suppression was sufficiently egregious.

14

Permissible sanctions for discovery misuse include "issue sanctions ordering that designated facts be taken as established or precluding the offending party from supporting or opposing designated claims or defenses, evidence sanctions prohibiting the offending party from introducing designated matters into evidence, and terminating sanctions that include striking part or all of the pleadings [or] dismissing part or all of the action . . . ." (*Cedars-Sinai, supra,* 18 Cal.4th at p. 12.)

We review a discovery sanctions order for abuse of discretion, looking to "whether the trial court's decision exceeded the bounds of reason." (*Cornerstone Realty Advisors, LLC v. Summit Healthcare REIT, Inc.* (2020) 56 Cal.App.5th 771, 789 (*Cornerstone*).) We review the court's factual findings for substantial evidence. (*Ibid.*)

Importantly, we must resolve any evidentiary conflicts most favorably to the trial court's ruling. If more than one reasonable inference can be deduced from the facts, we must accept the inference supporting the court's decision. (*Cornerstone, supra,* 56 Cal.App.5th at p. 789; see *Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1292 (*Reedy*) [we infer all necessary findings to support sanctions order if supported by substantial evidence].)

Here, substantial evidence supports the trial court's finding that Lasso and SpartaMed engaged in a "wholesale" "destruction and deletion of evidence on a widespread scale." For example, the court-ordered forensic examination revealed that in April 2017, Lasso deleted hundreds of documents related to ManaMed and TryABrace from his laptop, and in November 2019, he deleted his Outlook e-mail folder on ManaMed. Also, we infer SpartaMed deleted all its e-mails with Breg from the key period of 2016 and early 2017, considering that SpartaMed's document production contained virtually no e-mails from that window, but Breg's document production

15

contained dozens. And we infer Lasso and SpartaMed destroyed their records of at least six of the 45 missing Breg/Reynolds e-mails—e-mails which we know were sent based on the Breg/Reynolds productions, but which Lasso and SpartaMed inexplicably failed to produce in their own productions—in a way that could not be tracked.

That destruction of evidence is compounded by Lasso's and SpartaMed's repeated discovery abuses. For example, when asked for its communications with Breg, SpartaMed falsely said it had no responsive documents in its possession, custody, and control because it had given them to Breg, when in fact its counsel and forensic provider had retained a copy. Then, when asked why it had not produced the 34 key Breg e-mails in particular, SpartaMed falsely claimed it had returned those documents to Breg in 2020, when in fact those e-mails were not part of any data transfer to Breg.[12]

In addition, the forensic examiner's search for the 45 unproduced Breg/Reynolds e-mails revealed that Lasso's and SpartaMed's devices contained multiple copies of over 30 of those e-mails—not in deleted folders or recycle bins, but in accessible locations. This means Lasso and SpartaMed failed to produce dozens of responsive documents in their possession, custody, and control, despite extensive meet and confer efforts about those very e-mails.

We recognize that Lasso and SpartaMed dispute various elements of Garlie's lengthy report and assert that certain deleted files were preserved in recycle bins. But we have reviewed the record and do not see

---

[12] The trial court sanctioned SpartaMed over $13,000 for its discovery abuses.

16

evidence (aside from conclusory statements in Pixley's declaration) to support that assertion.[13] And in any event, we must resolve any evidentiary conflicts and draw all inferences in favor of the trial court's ruling. We thus find substantial evidence that Lasso and SpartaMed engaged in pervasive discovery abuses and repeatedly destroyed or otherwise suppressed evidence that should have been produced in discovery. The court permissibly imposed serious sanctions for such serious dereliction of discovery duties.

More fundamentally, spoliation is not limited to irreversibly destroying evidence so that it is lost forever. Spoliation includes "the intentional destruction *or suppression* of evidence." (*R.S. Creative, supra,* 75 Cal.App.4th at p. 497, emphasis added.) Although sending electronic information to the recycle bin may not necessarily result in the information's destruction, it certainly suppresses that information.

Lasso, JNL, and SpartaMed assert the sanctions order was punitive and put plaintiffs in a better position than they otherwise would have been in. They are correct that a discovery sanction "'should not provide a windfall to the other party'" or put them "'in a better position than if [they] had obtained the discovery sought and it had been favorable.'" (*Kwan Software Engineering, Inc. v. Hennings* (2020) 58 Cal.App.5th 57, 75.) The sanctions order put plaintiffs in exactly the position they would be if the missing documents "had been favorable" to them and established Lasso's and SpartaMed's liability.

Lasso and SpartaMed contend plaintiffs failed to show the deletions caused any prejudice. This is an unfair argument considering

---

[13] For example, the record citations on page 40 of the opening brief do not appear to support defendants' preservation argument.

defendants' "own actions make that showing difficult, if not impossible." (See *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1184 (*Murphy*).) Once plaintiffs made a prima facie showing that Lasso and SpartaMed destroyed or concealed relevant evidence, the burden shifted to Lasso and SpartaMed to show a lack of prejudice. (See *Williams v. Russ* (2008) 167 Cal.App.4th 1215, 1227 [burden shifting]; see also *id.* at p. 1224 [document destruction "raise[d] an inference" that party had "cherry-pick[ed]" favorable documents and destroyed "unfavorable" ones].) "When a party does not produce ordered documents, the court is entitled to infer the documents would contain evidence damaging to that party's case and instruct the jury accordingly." (*Lopez v. Watchtower Bible & Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 605; see also *Murphy,* at p. 1184 ["The mere fact plaintiffs' forensic consultant recovered some of the data does not mean none was lost"].)

Lasso, JNL, and SpartaMed assert the sanctions order improperly "lumped" them together even though there was no showing of who deleted what. But, as noted above, the record includes sanctionable conduct by both Lasso *and* SpartaMed. And since JNL is Lasso's wholly owned company and was added by Lasso at the eleventh hour solely to ensure his cross-complaint did not fail for lack of standing, we discern no error in extending sanctions for Lasso's discovery abuses to JNL.

Lasso and SpartaMed further contend there was no evidence they willfully destroyed or suppressed evidence with a culpable state of mind. However, "willfulness is no longer a requirement for the imposition of discovery sanctions." (*Reedy, supra,* 148 Cal.App.4th at p. 1291; see *Shiheiber v. JPMorgan Chase Bank, N.A.* (2022) 81 Cal.App.5th 688, 703 [discovery sanctions statutes "do not require a showing of willfulness, much less bad

18

faith"].) In any event, there is ample evidence here of intentional conduct, including repeated discovery abuses over a considerable time period despite ongoing meet and confer efforts.

Finally, Lasso and JNL assert the terminating sanction striking their cross-complaint was an abuse of discretion because the trial court did not consider a lesser sanction. They are correct that severe sanctions are disfavored if lesser sanctions are available. (*City of Los Angeles v. PricewaterhouseCoopers, LLP* (2024) 17 Cal.5th 46, 63.) But the court here had repeatedly entered discovery orders against SpartaMed and Lasso and had repeatedly imposed monetary sanctions against SpartaMed and its counsel—all to little effect. True, the monetary sanctions were largely issued against SpartaMed, not Lasso and JNL, but Lasso and JNL were equal participants in this multi-year discovery dispute. Indeed, they were represented by the same counsel as SpartaMed, and Lasso repeatedly took the same apathetic attitude as SpartaMed toward the holes and inconsistencies in defendants' production. Further, the record confirms Lasso and JNL had ample warning that the trial court intended to enforce the parties' compliance with their discovery obligations.

Where "[t]he record demonstrates [a] defendant engaged in repeated and egregious violations of the discovery laws that not only impaired plaintiff's rights, but threatened the integrity of the judicial process," it can be an error *not* to impose terminating sanctions. (*Doppes v. Bentley Motors, Inc.* (2009) 174 Cal.App.4th 967, 971; see *Reedy, supra,* 148 Cal.App.4th at pp. 1274, 1293 [affirming terminating sanctions where the sanctioned parties' "obduracy was plenary" and their "entire course of conduct in this case [could] be fairly summed up in two words: 'Make me.'"].) Such was the case here. After years of discovery disputes arising from Lasso's

19

and SpartaMed's misleading responses, their continued suppression of responsive documents, and their destruction of electronic records, the trial court did not abuse its discretion in imposing issue and terminating sanctions.

## II.

### THE TRIAL COURT PROPERLY EXCLUDED LASSO'S "MITIGATION EVIDENCE"

Lasso and SpartaMed next assert the trial court erred when it prevented them from introducing certain "mitigation" evidence at trial. They sought to present evidence that Lasso told Össur he was developing PlasmaFlow, but Össur passed on the opportunity to manufacture the device and did not tell Lasso to stop. According to defense counsel, this evidence was relevant to show Össur could have prevented Lasso from developing PlasmaFlow and therefore failed to mitigate its losses. The court did not allow it, noting "that is not a legitimate mitigation-of-damages argument."

We agree with the trial court. A plaintiff of course has a duty to mitigate damages. (*Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1568.) But we are aware of no authority that a company must explicitly tell its fiduciary not to develop a competing product, at risk of limiting its damages. A contrary rule would enable a rogue employee to reduce damages by living out the "The Scorpion and the Frog" fable and simply asserting, "Well, you knew I couldn't be trusted."[14]

---

[14] The opening brief includes cursory references to the fact that the trial court also precluded Lasso and SpartaMed from raising a statute of limitations defense regarding their development of PlasmaFlow. However, because they do not develop that argument, we do not consider it further.

## III.

### THE PUNITIVE DAMAGES AWARD IS NOT PRESUMPTIVELY EXCESSIVE

Lasso next contends the $10 million punitive damages award is presumptively excessive because it exceeds 10 percent of his alleged net worth and because the evidence on his financial condition was faulty. We disagree.

When reviewing a punitive damages award for excessiveness, one of the main factors we consider is the defendant's financial position.[15] (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110.) This factor is relevant because the purpose of punitive damages "is to deter, not to destroy." (*Id*. at p. 112.) For us to affirm a punitive damages award, the record must contain "meaningful evidence of the defendant's financial condition." (*Id*. at p. 109; see *Doe v. Lee* (2022) 79 Cal.App.5th 612, 618 [substantial evidence review].)

The record here contains substantial (albeit imperfect) evidence concerning Lasso's considerable financial position: a 2022 personal financial statement listing his net worth as over $18.6 million; his ownership interests in real estate in California, Hawaii, Montana, Nevada, and Texas; his 40 percent interest in ManaMed, which he declined to value at trial but which was listed for sale in 2020 for $100 million; and his ownership interests in at least five other businesses. During closing arguments, plaintiffs' counsel emphasized that Lasso had repeatedly dodged questions about his financial condition. It appears his evasiveness may have contributed to the sizable

---

[15] The other two relevant factors are "the particular nature of the defendant's acts" and "the amount of compensatory damages awarded." (*Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928.) Lasso does not challenge the punitive damages award based on either of those factors.

award, as the jury ultimately awarded plaintiffs a total of $10 million in punitive damages—$2 million more than what they asked for.

Lasso insists the award is presumptively excessive because it is more than 10 percent of his alleged net worth of $60 million.[16] (See *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 308 [punitive damages "'generally are not allowed to exceed 10 percent of the net worth of the defendant'"].) We are not persuaded. Other courts have "reject[ed] the argument that 10 percent of net worth constitutes a ceiling above which juries may not go in setting the amount of punitive damages." (*Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 83 (*Bankhead*); see *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 624–625 [similar].) It is well recognized that since net worth is subject to easy manipulation, it "is not the only measure for determining whether punitive damages are excessive." (*Cameron v. Las Orchidias Properties, LLC* (2022) 82 Cal.App.5th 481, 524 (*Cameron*).)

In our view, the proper question is not quantitative but qualitative—does the award properly punish and deter, in light of the defendant's wealth and the gravity of his acts? (*Cameron, supra,* 82 Cal.App.5th at p. 524; *Bankhead, supra,* 205 Cal.App.4th at p. 83.) On this record, we cannot say that the jury's award is disproportionate.

---

[16] The opening brief states that plaintiffs "argued that Lasso's net worth was as high as $60,538,089" without any record citation showing that figure was what plaintiffs had argued. While Lasso takes a paragraph to critique the evidence of the value of his financial interests, he does not develop any argument concerning debts or liabilities.

## IV.

### THE TRIAL COURT MUST CONSIDER THE OFFSET ISSUE ON REMAND

Finally, Lasso and SpartaMed claim the trial court erred in denying them an offset for ManaMed's 2022 settlement with Össur and Team Makena. "A nonsettling defendant is entitled to a setoff for all preverdict settlements 'in the amount stipulated by the [settlement agreements], or in the amount of the consideration paid for [them], whichever is the greater.' [Citation.] A plaintiff has 'the burden . . . to show that [the defendant is] not entitled to a credit in the full amount of the settlements because some portion of the recovery should be allocated to other claims.'" (*Hellam v. Crane Co.* (2015) 239 Cal.App.4th 851, 860, fn. omitted; see § 877, subd. (a).)

Before trial, when defense counsel raised the issue of defendants' entitlement to an offset for the ManaMed settlement, the trial court responded that was "not a jury issue" and told counsel to raise the issue postverdict. After judgment was entered, Lasso and SpartaMed requested an offset as part of their JNOV motion and filed the ManaMed settlement agreement under seal. The court denied the JNOV motion without addressing the offset request.

The trial court should have addressed the request. "The cases show that the procedure for applying a section 877 settlement credit varies." (*Wade v. Schrader* (2008) 168 Cal.App.4th 1039, 1047.) When a defendant's entitlement to an offset is not considered by the jury, "the nonsettling defendant may raise the issue after the verdict but before judgment so that the trial court may calculate the judgment with the settlement credit in mind. [Citations.] And there are cases in which the trial court has applied a settlement credit by amending the judgment to reflect the credit." (*Id.* at p. 1048; cf. *Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 264 [court had

23

discretion to invite postjudgment ex parte application to offset settlement].) Here, defendants appropriately raised the issue after verdict, in this case by JNOV, but it does not appear the court considered the request. We cannot do so in the first instance, as the record is silent as to what portion of the settlement, if any, ManaMed has paid. (See *Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 100 ["a nonsettling defendant is not entitled to an offset for such a settlement until the settlement monies have been paid"].)

We therefore remand the case with instructions to the trial court to determine if it should award offset credits to Lasso and SpartaMed[17] and, if any portion of the settlement has been paid, to reserve jurisdiction to award future credits if appropriate, and to amend the judgment if appropriate to reflect the correct offset figure for the compensatory damages award.

---

[17] At oral argument, Team Makena's counsel argued there was no showing that Team Makena benefitted from the settlement. We do not reach that issue. The trial court should consider it in the first instance.

DISPOSITION

The discovery sanctions order is affirmed; the judgment is reversed in part and the matter is remanded to the trial court to consider Lasso and SpartaMed's offset request. In all other respects, the judgment is affirmed. In the interests of justice, plaintiffs shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278, subd. (a)(5).)


SCOTT, J.

WE CONCUR:


GOODING, ACTING P. J.


SCHWARM, J.*


*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.